# ANDRESEN *v.* MARYLAND

No. 74–1646. Argued February 25, 1976—Decided June 29, 1976

BLACKMUN, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, WHITE, POWELL, REHNQUIST, and STEVENS, JJ., joined. BRENNAN, J., *post*, p. 484, and MARSHALL, J., *post*, p. 493, filed dissenting opinions.

*Peter C. Andresen,* petitioner, *pro se,* argued the cause and filed a brief.

*Jon F. Oster,* Deputy Attorney General of Maryland, argued the cause for respondent. With him on the brief were *Francis B. Burch,* Attorney General, and *Clarence W. Sharp* and *Gilbert Rosenthal,* Assistant Attorneys General.

*Deputy Solicitor General Randolph* argued the cause for the United States as *amicus curiae* urging affirmance. On the brief were *Solicitor General Bork, Deputy Solici-*

*tor General Frey, Stuart A. Smith,* and *Edward R. Korman.*

MR. JUSTICE BLACKMUN delivered the opinion of the Court.

This case presents the issue whether the introduction into evidence of a person's business records, seized during a search of his offices, violates the Fifth Amendment's command that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." We also must determine whether the particular searches and seizures here were "unreasonable" and thus violated the prohibition of the Fourth Amendment.

## I

In early 1972, a Bi-County Fraud Unit, acting under the joint auspices of the State's Attorneys' Offices of Montgomery and Prince George's Counties, Md., began an investigation of real estate settlement activities in the Washington, D. C., area. At the time, petitioner Andresen was an attorney who, as a sole practitioner, specialized in real estate settlements in Montgomery County. During the Fraud Unit's investigation, his activities came under scrutiny, particularly in connection with a transaction involving Lot 13T in the Potomac Woods subdivision of Montgomery County. The investigation, which included interviews with the purchaser, the mortgage holder, and other lienholders of Lot 13T, as well as an examination of county land records, disclosed that petitioner, acting as settlement attorney, had defrauded Standard-Young Associates, the purchaser of Lot 13T. Petitioner had represented that the property was free of liens and that, accordingly, no title insurance was necessary, when in fact, he knew that there were two outstanding liens on the property. In addition, investigators

learned that the lienholders, by threatening to foreclose their liens, had forced a halt to the purchaser's construction on the property. When Standard-Young had confronted petitioner with this information, he responded by issuing, as an agent of a title insurance company, a title policy guaranteeing clear title to the property. By this action, petitioner also defrauded that insurance company by requiring it to pay the outstanding liens.

The investigators, concluding that there was probable cause to believe that petitioner had committed the state crime of false pretenses, see Md. Ann. Code, Art. 27, § 140 (1976), against Standard-Young, applied for warrants to search petitioner's law office and the separate office of Mount Vernon Development Corporation, of which petitioner was incorporator, sole shareholder, resident agent, and director. The application sought permission to search for specified documents pertaining to the sale and conveyance of Lot 13T. A judge of the Sixth Judicial Circuit of Montgomery County concluded that there was probable cause and issued the warrants.

The searches of the two offices were conducted simultaneously during daylight hours on October 31, 1972.[1] Petitioner was present during the search of his law office and was free to move about. Counsel for him was present during the latter half of the search. Between 2% and 3% of the files in the office were seized. A single investigator, in the presence of a police officer, conducted

---

[1] Before these search warrants were executed, the Bi-County Fraud Unit had also received complaints concerning other Potomac Woods real estate transactions conducted by petitioner. The gist of the complaints was that petitioner, as settlement attorney, took money from three sets of home purchasers upon assurances that he would use it to procure titles to their properties free and clear of all encumbrances. It was charged that he had misappropriated the money so that they had not received clear title to the properties as promised.

the search of Mount Vernon Development Corporation. This search, taking about four hours, resulted in the seizure of less than 5% of the corporation's files.

Petitioner eventually was charged, partly by information and partly by indictment, with the crime of false pretenses, based on his misrepresentation to Standard-Young concerning Lot 13T, and with fraudulent misappropriation by a fiduciary, based on similar false claims made to three home purchasers. Before trial began, petitioner moved to suppress the seized documents. The trial court held a full suppression hearing. At the hearing, the State returned to petitioner 45 of the 52 items taken from the offices of the corporation. The trial court suppressed six other corporation items on the ground that there was no connection between them and the crimes charged. The net result was that the only item seized from the corporation's offices that was not returned by the State or suppressed was a single file labeled "Potomac Woods General." In addition, the State returned to petitioner seven of the 28 items seized from his law office, and the trial court suppressed four other law office items based on its determination that there was no connection between them and the crime charged.

With respect to all the items not suppressed or returned, the trial court ruled that admitting them into evidence would not violate the Fifth and Fourth Amendments. It reasoned that the searches and seizures did not force petitioner to be a witness against himself because he had not been required to produce the seized documents, nor would he be compelled to authenticate them. Moreover, the search warrants were based on probable cause, and the documents not returned or suppressed were either directly related to Lot 13T, and therefore within the express language of the warrants, or properly seized and otherwise admissible to show a pattern of

criminal conduct relevant to the charge concerning Lot 13T.

At trial, the State proved its case primarily by public land records and by records provided by the complaining purchasers, lienholders, and the title insurance company. It did introduce into evidence, however, a number of the seized items. Three documents from the "Potomac Woods General" file, seized during the search of petitioner's corporation, were admitted. These were notes in the handwriting of an employee who used them to prepare abstracts in the course of his duties as a title searcher and law clerk. The notes concerned deeds of trust affecting the Potomac Woods subdivision and related to the transaction involving Lot 13T.[2] Five items seized from petitioner's law office were also admitted. One contained information relating to the transactions with one of the defrauded home buyers. The second was a file partially devoted to the Lot 13T transaction; among the documents were settlement statements, the deed conveying the property to Standard-Young Associates, and the original and a copy of a notice to the buyer about releases of liens. The third item was a file devoted exclusively to Lot 13T. The fourth item consisted of a copy of a deed of trust, dated March 27, 1972, from the seller of certain lots in the Potomac Woods subdivision to a lienholder.[3] The fifth item contained drafts of

---

[2] It is established that the privilege against self-incrimination may not be invoked with respect to corporate records. *Bellis* v. *United States,* 417 U. S. 85, 88–89 (1974); *Grant* v. *United States,* 227 U. S. 74 (1913); *Hale* v. *Henkel,* 201 U. S. 43, 70 (1906). It appears, however, that the records seized at the corporation's office were really not corporate records, but were records generated by petitioner's practice as a real estate lawyer. United States Appendix of Exhibits 1–3.

[3] This item was introduced as proof that petitioner failed to pay

documents and memoranda written in petitioner's handwriting.

After a trial by jury, petitioner was found guilty upon five counts of false pretenses and three counts of fraudulent misappropriation by a fiduciary. He was sentenced to eight concurrent two-year prison terms.

On appeal to the Court of Special Appeals of Maryland, four of the five false-pretenses counts were reversed because the indictment had failed to allege intent to defraud, a necessary element of the state offense. Only the count pertaining to Standard-Young's purchase of Lot 13T remained. With respect to this count of false pretenses and the three counts of misappropriation by a fiduciary, the Court of Special Appeals rejected petitioner's Fourth and Fifth Amendment Claims.[4] Specifically, it held that the warrants were supported by probable cause, that they did not authorize a general search in violation of the Fourth Amendment, and that the items admitted into evidence against petitioner at trial were within the scope of the warrants or were otherwise properly seized. It agreed with the trial court that the search had not violated petitioner's Fifth Amendment rights because petitioner had not been compelled to do anything. 24 Md. App. 128, 331 A. 2d 78 (1975).

---

recording taxes, a charge that was abandoned before the case was submitted to the jury.

[4] The Solicitor General, in an *amicus* brief filed with this Court, has suggested that the evidence forming the basis of two of the counts of misappropriation by a fiduciary, which were upheld on appeal, was obtained entirely from sources other than petitioner's offices. Brief for United States as *Amicus Curiae* 12–14, 24–25, n. 17. This fact, if true, does not, of course, affect our jurisdiction but it would permit us to apply the discretionary concurrent-sentence doctrine, *Benton* v. *Maryland,* 395 U. S. 784, 791 (1969), and thereby decline to consider petitioner's constitutional claims. *Barnes* v. *United States,* 412 U. S. 837, 848 n. 16 (1973).

We granted certiorari limited to the Fourth and Fifth Amendment issues. 423 U. S. 822 (1975).[5]

## II

The Fifth Amendment, made applicable to the States by the Fourteenth Amendment, *Malloy* v. *Hogan,* 378 U. S. 1, 8 (1964), provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." As the Court often has noted, the development of this protection was in part a response to certain historical practices, such as ecclesiastical inquisitions and the proceedings of the Star Chamber, "which placed a premium on compelling subjects of the investigation to admit guilt from their own lips." *Michigan* v. *Tucker,* 417 U. S. 433, 440 (1974). See generally L. Levy, Origins of the Fifth Amendment (1968). The "historic function" of the privilege has been to protect a " 'natural individual from compulsory incrimination through his

---

[5] Both the trial and appellate courts in this case recognized the conflict among the Federal Courts of Appeals over whether documentary evidence not obtainable by means of a subpoena or a summons may be obtained by means of a search warrant. Thus, in *Hill* v. *Philpott,* 445 F. 2d 144 (CA7), cert. denied, 404 U. S. 991 (1971), the Court of Appeals held that evidence not obtainable by means of a subpoena could not be seized by means of a search warrant. The substantial majority position is of the opposite view. *Shaffer* v. *Wilson,* 523 F. 2d 175 (CA10 1975), cert. pending, No. 75–601; *United States* v. *Murray,* 492 F. 2d 178, 191 (CA9 1973); *Taylor* v. *Minnesota,* 466 F. 2d 1119 (CA8 1972), cert. denied, 410 U. S. 956 (1973); *United States* v. *Blank,* 459 F. 2d 383 (CA6), cert. denied, 409 U. S. 887 (1972); *United States* v. *Scharfman,* 448 F. 2d 1352 (CA2 1971), cert. denied, 405 U. S. 919 (1972); *United States* v. *Bennett,* 409 F. 2d 888, 896 (CA2), cert. denied *sub nom. Jessup* v. *United States,* 396 U. S. 852 (1969). The majority position accords with the views of Wigmore. 8 J. Wigmore, Evidence § 2264, p. 380 (McNaughton Rev. 1961).

The Court of Special Appeals adopted the majority position and, therefore, upheld the admission of the records into evidence.

own testimony or personal records.' " *Bellis* v. *United States,* 417 U. S. 85, 89–90 (1974), quoting from *United States* v. *White,* 322 U. S. 694, 701 (1944).

There is no question that the records seized from petitioner's offices and introduced against him were incriminating. Moreover, it is undisputed that some of these business records contain statements made by petitioner. Cf. *United States* v. *Mara,* 410 U. S. 19, 21–22 (1973); *United States* v. *Dionisio,* 410 U. S. 1 (1973); *Gilbert* v. *California,* 388 U. S. 263, 266–267 (1967); *United States* v. *Wade,* 388 U. S. 218 (1967); and *Schmerber* v. *California,* 384 U. S. 757 (1966). The question, therefore, is whether the seizure of these business records, and their admission into evidence at his trial, compelled petitioner to testify against himself in violation of the Fifth Amendment. This question may be said to have been reserved in *Warden* v. *Hayden,* 387 U. S. 294, 302–303 (1967), and it was adverted to in *United States* v. *Miller,* 425 U. S. 435, 441 n. 3 (1976).

Petitioner contends that "the Fifth Amendment prohibition against compulsory self-incrimination applies as well to personal business papers seized from his offices as it does to the same papers being required to be produced under a subpoena." Brief for Petitioner 9. He bases his argument, naturally, on dicta in a number of cases which imply, or state, that the search for and seizure of a person's private papers violate the privilege against self-incrimination. Thus, in *Boyd* v. *United States,* 116 U. S. 616, 633 (1886), the Court said: "[W]e have been unable to perceive that the seizure of a man's private books and papers to be used in evidence against him is substantially different from compelling him to be a witness against himself." And in *Hale* v. *Henkel,* 201 U. S. 43, 76 (1906), it was observed that "the substance of the offense is the compulsory production of private

papers, whether under a search warrant or a *subpoena duces tecum*, against which the person . . . is entitled to protection."

We do not agree, however, that these broad statements compel suppression of this petitioner's business records as a violation of the Fifth Amendment. In the very recent case of *Fisher* v. *United States*, 425 U. S. 391 (1976), the Court held that an attorney's production, pursuant to a lawful summons, of his client's tax records in his hands did not violate the Fifth Amendment privilege of the taxpayer "because enforcement against a taxpayer's lawyer would not 'compel' the taxpayer to do anything—and certainly would not compel him to be a 'witness' against himself." *Id.*, at 397. We recognized that the continued validity of the broad statements contained in some of the Court's earlier cases had been discredited by later opinions. *Id.*, at 407–409. In those earlier cases, the legal predicate for the inadmissibility of the evidence seized was a violation of the Fourth Amendment; the unlawfulness of the search and seizure was thought to supply the compulsion of the accused necessary to invoke the Fifth Amendment.[6] Compulsion of the accused was also absent in *Couch* v. *United States*,

---

[6] In *Boyd* v. *United States*, 116 U. S. 616 (1886), for example, it was held that the Government could not, consistently with the Fourth Amendment, obtain "mere evidence" from the accused; accordingly, a subpoena seeking "mere evidence" constituted compulsion of the accused against which he could invoke the Fifth Amendment. The "mere evidence" rule was overturned in *Warden* v. *Hayden*, 387 U. S. 294, 301–302 (1967).

The "convergence theory" of the Fourth and Fifth Amendments is also illustrated by *Agnello* v. *United States*, 269 U. S. 20 (1925), where the seizure of contraband pursuant to a search not incident to arrest and otherwise unlawful in violation of the Fourth Amendment was held to permit the accused to invoke the Fifth Amendment when the Government sought to introduce this evidence in a criminal proceeding against him.

409 U. S. 322 (1973), where the Court held that a summons served on a taxpayer's accountant requiring him to produce the taxpayer's personal business records in his possession did not violate the taxpayer's Fifth Amendment rights.[7]

Similarly, in this case, petitioner was not asked to say or to do anything. The records seized contained statements that petitioner had voluntarily committed to writing. The search for and seizure of these records were conducted by law enforcement personnel. Finally, when these records were introduced at trial, they were authenticated by a handwriting expert, not by petitioner. Any compulsion of petitioner to speak, other than the inherent psychological pressure to respond at trial to unfavorable evidence, was not present.

This case thus falls within the principle stated by Mr. Justice Holmes: "A party is privileged from producing the evidence but not from its production." *Johnson* v. *United States*, 228 U. S. 457, 458 (1913). This principle recognizes that the protection afforded by the Self-Incrimination Clause of the Fifth Amendment "adheres basically to the person, not to information that may incriminate him." *Couch* v. *United States*, 409 U. S., at 328. Thus, although the Fifth Amendment may protect an individual from complying with a subpoena for the

---

[7] Petitioner relies on the statement in *Couch* that "possession bears the closest relationship to the personal compulsion forbidden by the Fifth Amendment," 409 U. S., at 331, in support of his argument that possession of incriminating evidence itself supplies the predicate for invocation of the privilege. *Couch,* of course, was concerned with the production of documents pursuant to a summons directed to the accountant where there might have been a possibility of compulsory self-incrimination by the principal's implicit or explicit "testimony" that the documents were those identified in the summons. The risk of authentication is not present where the documents are seized pursuant to a search warrant.

production of his personal records in his possession because the very act of production may constitute a compulsory authentication of incriminating information, see *Fisher* v. *United States, supra,* a seizure of the same materials by law enforcement officers differs in a crucial respect—the individual against whom the search is directed is not required to aid in the discovery, production, or authentication of incriminating evidence.

A contrary determination that the seizure of a person's business records and their introduction into evidence at a criminal trial violates the Fifth Amendment, would undermine the principles announced in earlier cases. Nearly a half century ago, in *Marron* v. *United States,* 275 U. S. 192 (1927), the Court upheld, against both Fourth and Fifth Amendment claims, the admission into evidence of business records seized during a search of the accused's illegal liquor business. And in *Abel* v. *United States,* 362 U. S. 217 (1960), the Court again upheld, against both Fourth and Fifth Amendment claims, the introduction into evidence at an espionage trial of false identity papers and a coded message seized during a search of the accused's hotel room. These cases recognize a general rule: "There is no special sanctity in papers, as distinguished from other forms of property, to render them immune from search and seizure, if only they fall within the scope of the principles of the cases in which other property may be seized, and if they be adequately described in the affidavit and warrant." *Gouled* v. *United States,* 255 U. S. 298, 309 (1921).

Moreover, a contrary determination would prohibit the admission of evidence traditionally used in criminal cases and traditionally admissible despite the Fifth Amendment. For example, it would bar the admission of an accused's gambling records in a prosecution for

gambling; a note given temporarily to a bank teller during a robbery and subsequently seized in the accused's automobile or home in a prosecution for bank robbery; and incriminating notes prepared, but not sent, by an accused in a kidnaping or blackmail prosecution.

We find a useful analogy to the Fifth Amendment question in those cases that deal with the "seizure" of oral communications. As the Court has explained, " '[t]he constitutional privilege against self-incrimination . . . is designed to prevent the use of legal process to force from the lips of the accused individual the evidence necessary to convict him or to force him to produce and authenticate any personal documents or effects that might incriminate him.' " *Bellis* v. *United States,* 417 U. S., at 88, quoting *United States* v. *White,* 322 U. S., at 698. The significant aspect of this principle was apparent and applied in *Hoffa* v. *United States,* 385 U. S. 293 (1966), where the Court rejected the contention that an informant's "seizure" of the accused's conversation with him, and his subsequent testimony at trial concerning that conversation, violated the Fifth Amendment. The rationale was that, although the accused's statements may have been elicited by the informant for the purpose of gathering evidence against him, they were made voluntarily. We see no reasoned distinction to be made between the compulsion upon the accused in that case and the compulsion in this one. In each, the communication, whether oral or written, was made voluntarily. The fact that seizure was contemporaneous with the communication in *Hoffa* but subsequent to the communication here does not affect the question whether the accused was compelled to speak.

Finally, we do not believe that permitting the introduction into evidence of a person's business records seized during an otherwise lawful search would offend or under-

mine any of the policies undergirding the privilege. *Murphy* v. *Waterfront Comm'n,* 378 U. S. 52, 55 (1964).[8]

In this case, petitioner, at the time he recorded his communication, at the time of the search, and at the time the records were admitted at trial, was not subjected to "the cruel trilemma of self-accusation, perjury or contempt." *Ibid.* Indeed, he was never required to say or to do anything under penalty of sanction. Similarly, permitting the admission of the records in question does not convert our accusatorial system of justice into an inquisitorial system. "The requirement of specific charges, their proof beyond a reasonable doubt, the protection of the accused from confessions extorted through whatever form of police pressures, the right to a prompt hearing before a magistrate, the right to assistance of counsel, to be supplied by government when circumstances make it necessary, the duty to advise an accused of his constitutional rights—these are all characteristics of the accusatorial system and manifestations of its demands." *Watts* v. *Indiana,* 338 U. S. 49, 54 (1949). None of these

---

[8] "The privilege against self-incrimination . . . reflects many of our fundamental values and most noble aspirations: our unwillingness to subject those suspected of crime to the cruel trilemma of self-accusation, perjury or contempt; our preference for an accusatorial rather than an inquisitorial system of criminal justice; our fear that self-incriminating statements will be elicited by inhumane treatment and abuses; our sense of fair play which dictates 'a fair state-individual balance by requiring the government to leave the individual alone until good cause is shown for disturbing him and by requiring the government in its contest with the individual to shoulder the entire load' . . . ; our respect for the inviolability of the human personality and of the right of each individual 'to a private enclave where he may lead a private life' . . . ; our distrust of self-deprecatory statements; and our realization that the privilege, while sometimes 'a shelter to the guilty,' is often 'a protection to the innocent.'"

attributes is endangered by the introduction of business records "independently secured through skillful investigation." *Ibid.* Further, the search for and seizure of business records pose no danger greater than that inherent in every search that evidence will be "elicited by inhumane treatment and abuses." 378 U. S., at 55. In this case, the statements seized were voluntarily committed to paper before the police arrived to search for them, and petitioner was not treated discourteously during the search. Also, the "good cause" to "disturb," *ibid.*, petitioner was independently determined by the judge who issued the warrants; and the State bore the burden of executing them. Finally, there is no chance, in this case, of petitioner's statements being self-deprecatory and untrustworthy because they were extracted from him—they were already in existence and had been made voluntarily.

We recognize, of course, that the Fifth Amendment protects privacy to some extent. However, "the Court has never suggested that every invasion of privacy violates the privilege." *Fisher* v. *United States,* 425 U. S., at 399. Indeed, we recently held that unless incriminating testimony is "compelled," any invasion of privacy is outside the scope of the Fifth Amendment's protection, saying that "the Fifth Amendment protects against 'compelled self-incrimination, not [the disclosure of] private information.' " *Id.,* at 401. Here, as we have already noted, petitioner was not compelled to testify in any manner.

Accordingly, we hold that the search of an individual's office for business records, their seizure, and subsequent introduction into evidence do not offend the Fifth Amendment's proscription that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself."

## III

We turn next to petitioner's contention that rights guaranteed him by the Fourth Amendment were violated because the descriptive terms of the search warrants were so broad as to make them impermissible "general" warrants, and because certain items were seized in violation of the principles of *Warden* v. *Hayden,* 387 U. S. 294 (1967).[9]

---

[9] Petitioner also contends that the affidavits do not establish probable cause and that the failure of the State formally to introduce the warrants into evidence violated his constitutional rights. These contentions may be disposed of summarily.

The bases of petitioner's argument that the affidavits failed to establish probable cause are two: The affidavits, in violation of *Aguilar* v. *Texas,* 378 U. S. 108 (1964), did not establish the reliability of the information or the credibility of the informants; and the information on which they were based was so stale that there was no reason to believe that the documents sought were still in petitioner's possession.

The affidavits clearly establish the reliability of the information related and the credibility of its sources. The complainants are named, their positions are described, and their transactions with petitioner are related in a comprehensive fashion. In addition, the special-agent affiants aver that they have verified, at least in part, the complainants' charges by examining their correspondence with petitioner, numerous documents reflecting the transactions, and public land records. Copies of many of these records and documents are attached to the affidavits; others are described in detail. Finally, the agents aver that they have interviewed, with positive results, other persons involved in the real estate transactions that were the object of the investigation. Rarely have we seen warrant-supporting affidavits so complete and so thorough. Petitioner's probable-cause argument is without merit. See *United States* v. *Ventresca,* 380 U. S. 102 (1965).

It is also argued that there was a three-month delay between the completion of the transactions on which the warrants were based, and the ensuing searches, and that this time lapse precluded a determination that there was probable cause to believe that petitioner's offices contained evidence of the crime. This contention is

*The specificity of the search warrants.* Although petitioner concedes that the warrants for the most part were models of particularity, Brief for Petitioner 28, he contends that they were rendered fatally "general" by the addition, in each warrant, to the exhaustive list of particularly described documents, of the phrase "together with other fruits, instrumentalities and evidence of crime at this [time] unknown." App. A. 95–A. 96, A. 115. The quoted language, it is argued, must be read in isolation and without reference to the rest of the long sentence at the end of which it appears. When

---

belied by the particular facts of the case. The business records sought were prepared in the ordinary course of petitioner's business in his law office or that of his real estate corporation. It is eminently reasonable to expect that such records would be maintained in those offices for a period of time and surely as long as the three months required for the investigation of a complex real estate scheme. In addition, special investigators knew that petitioner had secured a release on Lot 13T with respect to one lienholder only three weeks before the searches and that another lien remained to be released. All this, when considered with other information demonstrating that Potomac Woods was still a current concern of petitioner, amply supports the belief that petitioner retained the sought-for records.

The final contention is that under *Bumper* v. *North Carolina,* 391 U. S. 543, 550 n. 15 (1968), the failure of the prosecution formally to introduce the warrants into evidence precludes the State from relying upon them to justify the searches. We reject the argument for two reasons. First, it appears that petitioner based this claim of error solely on state grounds in the Court of Special Appeals. Second, even if the claim is properly before us, it fails. Both the State and the petitioner referred to and extensively discussed the language and terms of the warrants during the suppression hearing, and the trial judge, in deciding the motion to suppress, made numerous references to the warrants. The present case, therefore, is a far cry from *Bumper* where the prosecution's assertion that it had a search warrant was made for the first time during oral argument before this Court. There is nothing in the Fourth Amendment that requires us so to exalt formalism over substance.

read "properly," petitioner contends, it permits the search for and seizure of any evidence of any crime.

General warrants, of course, are prohibited by the Fourth Amendment. "[T]he problem [posed by the general warrant] is not that of intrusion *per se,* but of a general, exploratory rummaging in a person's belongings. . . . [The Fourth Amendment addresses the problem] by requiring a 'particular description' of the things to be seized." *Coolidge* v. *New Hampshire,* 403 U. S. 443, 467 (1971). This requirement " 'makes general searches . . . impossible and prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant.' " *Stanford* v. *Texas,* 379 U. S. 476, 485 (1965), quoting *Marron* v. *United States,* 275 U. S., at 196.

In this case we agree with the determination of the Court of Special Appeals of Maryland that the challenged phrase must be read as authorizing only the search for and seizure of evidence relating to "the crime of false pretenses with respect to Lot 13T." 24 Md. App., at 167, 331 A. 2d, at 103. The challenged phrase is not a separate sentence. Instead, it appears in each warrant at the end of a sentence containing a lengthy list of specified and particular items to be seized, all pertaining to Lot 13T.[10] We think it clear from the context

---

[10] "[T]he following items pertaining to sale, purchase, settlement and conveyance of lot 13, block T, Potomac Woods subdivision, Montgomery County, Maryland:

"title notes, title abstracts, title rundowns; contracts of sale and/or assignments from Raffaele Antonelli and Rocco Caniglia to Mount Vernon Development Corporation and/or others; lien payoff correspondence and lien pay-off memoranda to and from lienholders and noteholders; correspondence and memoranda to and from trustees of deeds of trust; lenders instructions for a construction loan or construction and permanent loan; disbursement sheets and

that the term "crime" in the warrants refers only to the crime of false pretenses with respect to the sale of Lot 13T. The "other fruits" clause is one of a series that follows the colon after the word "Maryland." All clauses in the series are limited by what precedes that colon, namely, "items pertaining to . . . lot 13, block T." The warrants, accordingly, did not authorize the executing officers to conduct a search for evidence of

disbursement memoranda; checks, check stubs and ledger sheets indicating disbursement upon settlement; correspondence and memoranda concerning disbursements upon settlement; settlement statements and settlement memoranda; fully or partially prepared deed of trust releases, whether or not executed and whether or not recorded; books, records, documents, papers, memoranda and correspondence, showing or tending to show a fraudulent intent, and/or knowledge as elements of the crime of false pretenses, in violation of Article 27, Section 140, of the Annotated Code of Maryland, 1957 Edition, as amended and revised, together with other fruits, instrumentalities and evidence of crime at this [time] unknown." App. A. 95–A. 96, A. 115.

Petitioner also suggests that the specific list of the documents to be seized constitutes a "general" warrant. We disagree. Under investigation was a complex real estate scheme whose existence could be proved only by piecing together many bits of evidence. Like a jigsaw puzzle, the whole "picture" of petitioner's false-pretense scheme with respect to Lot 13T could be shown only by placing in the proper place the many pieces of evidence that, taken singly, would show comparatively little. The complexity of an illegal scheme may not be used as a shield to avoid detection when the State has demonstrated probable cause to believe that a crime has been committed and probable cause to believe that evidence of this crime is in the suspect's possession. The specificity with which the documents are named here contrasts sharply with the absence of particularity in *Berger* v. *New York*, 388 U. S. 41, 58–59 (1967), where a state eavesdropping statute which authorized eavesdropping "without requiring belief that any particular offense has been or is being committed; nor that the 'property' sought, the conversations, be particularly described," was invalidated.

other crimes but only to search for and seize evidence relevant to the crime of false pretenses and Lot 13T.[11]

*The admissibility of certain items of evidence in light of Warden v. Hayden.* Petitioner charges that the seizure of documents pertaining to a lot other than Lot 13T violated the principles of *Warden* v. *Hayden* and therefore should have been suppressed. His objection appears to be that these papers were not relevant to the Lot 13T charge and were admissible only to prove another crime with which he was charged after the search. The fact that these documents were used to help form the evidentiary basis for another charge, it is argued, shows that the documents were seized solely for that purpose.

The State replies that *Warden* v. *Hayden* was not violated and that this is so because the challenged evidence is relevant to the question whether petitioner committed the crime of false pretenses with respect to Lot 13T. In Maryland, the crime is committed when a per-

---

[11] The record discloses that the officials executing the warrants seized numerous papers that were not introduced into evidence. Although we are not informed of their content, we observe that to the extent such papers were not within the scope of the warrants or were otherwise improperly seized, the State was correct in returning them voluntarily and the trial judge was correct in suppressing others.

We recognize that there are grave dangers inherent in executing a warrant authorizing a search and seizure of a person's papers that are not necessarily present in executing a warrant to search for physical objects whose relevance is more easily ascertainable. In searches for papers, it is certain that some innocuous documents will be examined, at least cursorily, in order to determine whether they are, in fact, among those papers authorized to be seized. Similar dangers, of course, are present in executing a warrant for the "seizure" of telephone conversations. In both kinds of searches, responsible officials, including judicial officials, must take care to assure that they are conducted in a manner that minimizes unwarranted intrusions upon privacy.

son makes a false representation of a past or existing fact, with intent to defraud and knowledge of its falsity, and obtains any chattel, money, or valuable security from another, who relies on the false representation to his detriment. *Polisher* v. *State,* 11 Md. App. 555, 560, 276 A. 2d 102, 104 (1971). Thus, the State is required to prove intent to defraud beyond a reasonable doubt. The State consequently argues that the documents pertaining to another lot in the Potomac Woods subdivision demonstrate that the misrepresentation with respect to Lot 13T was not the result of mistake on the part of petitioner.

In *Warden* v. *Hayden,* 387 U. S., at 307, the Court stated that when the police seize " 'mere evidence,' probable cause must be examined in terms of cause to believe that the evidence sought will aid in a particular apprehension or conviction. In so doing, consideration of police purposes will be required." In this case, we conclude that the trained special investigators reasonably could have believed that the evidence specifically dealing with another lot in the Potomac Woods subdivision could be used to show petitioner's intent with respect to the Lot 13T transaction.

The Court has often recognized that proof of similar acts is admissible to show intent or the absence of mistake. In *Nye & Nissen* v. *United States,* 336 U. S. 613 (1949), for example, a case involving a scheme of fraudulent conduct, it was said:

> "The evidence showed the presentation of eleven other false invoices. . . . The trial court also admitted it at the conclusion of the case 'for the sole purpose of proving guilty intent, motive, or guilty knowledge' of the defendants. Evidence that similar and related offenses were committed in this period tended to show a consistent pattern of conduct highly relevant to the issue of intent." *Id.,* at 618.

In the present case, when the special investigators secured the search warrants, they had been informed of a number of similar charges against petitioner arising out of Potomac Woods transactions. And, by reading numerous documents and records supplied by the Lot 13T and other complainants, and by interviewing witnesses, they had become familiar with petitioner's method of operation. Accordingly, the relevance of documents pertaining specifically to a lot other than Lot 13T, and their admissibility to show the Lot 13T offense, would have been apparent. Lot 13T and the other lot had numerous features in common. Both were in the same section of the Potomac Woods subdivision; both had been owned by the same person; and transactions concerning both had been handled extensively by petitioner. Most important was the fact that there were two deeds of trust in which both lots were listed as collateral. Unreleased liens respecting both lots were evidenced by these deeds of trusts. Petitioner's transactions relating to the other lot, subject to the same liens as Lot 13T, therefore, were highly relevant to the question whether his failure to deliver title to Lot 13T free of all encumbrances was mere inadvertence. Although these records subsequently were used to secure additional charges against petitioner, suppression of this evidence in this case was not required. The fact that the records could be used to show intent to defraud with respect to Lot 13T permitted the seizure and satisfied the requirements of *Warden* v. *Hayden.*

The judgment of the Court of Special Appeals of Maryland is affirmed.

*It is so ordered.*

MR. JUSTICE BRENNAN, dissenting.

In a concurring opinion earlier this Term in *Fisher* v. *United States,* 425 U. S. 391, 414 (1976), I stated my view

that the Fifth Amendment protects an individual citizen against the compelled production of testimonial matter that might tend to incriminate him, provided it is matter that comes within the zone of privacy recognized by the Amendment to secure to the individual "a private inner sanctum of individual feeling and thought." *Couch* v. *United States,* 409 U. S. 322, 327 (1973). Accordingly, the production of testimonial material falling within this zone of privacy may not be compelled by subpoena. The Court holds today that the search and seizure, pursuant to a valid warrant, of business records in petitioner's possession and containing statements made by the petitioner does not violate the Fifth Amendment. I can perceive no distinction of meaningful substance between compelling the production of such records through subpoena and seizing such records against the will of the petitioner. Moreover, I believe that the warrants under which petitioner's papers were seized were impermissibly general. I therefore dissent.[1]

I

"There is no question that the records seized from petitioner's offices and introduced against him were incriminating. Moreover, it is undisputed that some of these business records contain statements made by petitioner." *Ante,* at 471. It also cannot be questioned that these records fall within the zone of privacy protected by the Fifth Amendment. *Bellis* v. *United States,* 417 U. S. 85, 87–88 (1974), squarely recognized that "[t]he privilege applies to the business records of the sole proprietor or sole prac-

---

[1] Today's decision is doubtless consistent with the recent trend of decisions to eviscerate Fourth Amendment protections. See, *e. g., Texas* v. *White,* 423 U. S. 67 (1975); *United States* v. *Miller,* 425 U. S. 435 (1976); *United States* v. *Watson,* 423 U. S. 411 (1976); *United States* v. *Santana, ante,* p. 38.

titioner as well as to personal documents containing more intimate information about the individual's private life." The Court today retreats from this view. Though recognizing the value of privacy protected by the Fifth Amendment, see *ante,* at 477, and the " 'right of each individual "to a private enclave where he may lead a private life," ' " *ante,* at 476 n. 8, the Court declines, without adequate explanation, to include business records within that private zone comprising the mere physical extensions of an individual's thoughts and knowledge. As I noted in *Fisher,* the failure to give effect to such a zone ignores the essential spirit of the Fifth Amendment: "[Business] records are at least an extension of an aspect of a person's activities, though concededly not the more intimate aspects of one's life. Where the privilege would have protected one's mental notes of his business affairs in a less complicated day and age, it would seem that that protection should not fall away because the complexities of another time compel one to keep business records. Cf. *Olmstead* v. *United States,* 277 U. S. 438, 474 (1928) (Brandeis, J., dissenting)." 425 U. S., at 426–427 (BRENNAN, J., concurring in judgment).

As indicated at the outset, today's assault on the Fifth Amendment is not limited to narrowing this view of the scope of privacy respected by it. The Court also sanctions circumvention of the Amendment by indulging an unjustified distinction between production compelled by subpoena and production secured against the will of the petitioner through warrant. But a privilege protecting against the compelled production of testimonial material is a hollow guarantee where production of that material may be secured through the expedient of search and seizure.

The matter cannot be resolved on any simplistic notion of compulsion. Search and seizure is as rife with

elements of compulsion as subpoena. The intrusion occurs under the lawful process of the State. The individual is not free to resist that authority. To be sure, as the Court observes, "[p]etitioner was present during the search of his law office and was free to move about," *ante*, at 466, but I do not believe the Court means to suggest that petitioner was free to obstruct the investigators' search through his files.[2]

And compulsion does not disappear merely because the individual is absent at the time of search and seizure. The door to one's house, for example, is as much the individual's resistance to the intrusion of outsiders as his personal physical efforts to prevent the same. To refuse recognition to the sanctity of that door and, more generally, to confine the dominion of privacy to the mind, compels an unconstitutional disclosure by denying to the individual a zone of physical freedom necessary for conducting one's affairs. True to this principle, a value enshrined by the Fifth Amendment, the Court carefully observed in *Couch* that "actual possession of documents bears the most significant relationship to Fifth Amendment protections against governmental compulsions upon the individual accused of crime," 409 U. S., at 333, and that "[w]e do indeed attach constitutional importance to possession, but only because of its close relationship to those personal compulsions and intrusions which the Fifth Amendment forbids." *Id.*, at 336 n. 20. *Couch* also plainly indicated that it is not necessary that

[2] There is no meaningful distinction between requiring petitioner in this case to stand idly by while papers are extracted from his files and requiring the petitioner in *Schmerber* v. *California*, 384 U. S. 757 (1966), similarly to submit to the extraction of blood from his body. In either case, seizure is obtained by compulsion, yet in *Schmerber*, unlike here, Fifth Amendment limitations were recognized as applicable.

there be actual possession in order to invoke Fifth Amend-
ment limitations, for "situations may well arise where
constructive possession is so clear or the relinquishment
of possession is so temporary and insignificant as to leave
the personal compulsions upon the accused substantially
intact." *Id.*, at 333.[3]

Though the records involved in this case were clearly
within petitioner's possession or at least constructive
possession, the Court avoids application of these princi-
ples and the values they protect by what I submit is a
mischaracterization of *Couch* as concerned with the "pos-
sibility of compulsory self-incrimination by the princi-
pal's implicit or explicit 'testimony' that the documents
were those identified in the summons." *Ante*, at 473 n. 7.
Whether or not *Couch* was concerned with this possibil-
ity—and I believe that even under the most strained
reading it was not—*Couch* was clearly concerned with
whether production of documents in the possession of
the accused's accountant pursuant to a summons directed
to the accountant operated personally to compel the
accused. It was in this regard that *Couch* recognized
that "possession bears the closest relationship to the per-
sonal compulsion forbidden by the Fifth Amendment,"

---

[3] Similarly, I recognized writing separately in *Couch:*

"[S]urely the availability of the Fifth Amendment privilege
cannot depend on whether or not the owner of the documents is
compelled personally to turn the documents over to the Govern-
ment. If private, testimonial documents held in the owner's own
possession are privileged under the Fifth Amendment, then the Gov-
ernment cannot nullify that privilege by finding a way to obtain
the documents without requiring the owner to take them in hand
and personally present them to the Government agents. Where the
Government takes private records from, for example, a safety de-
posit box against the will of the owner of the documents, the owner
has been compelled, in my view, to incriminate himself within the
meaning of the Fifth Amendment." 409 U. S., at 337 n.
(concurring).

409 U. S., at 331, a matter with which the Court refuses to deal in its treatment of *Couch*.

*Couch* only reflects the view of a long line of decisions explicitly recognizing that the seizure of private papers may violate the Fifth Amendment. As early as *Boyd* v. *United States,* 116 U. S. 616, 633 (1886), the Court was "unable to perceive that the seizure of a man's private books and papers to be used in evidence against him is substantially different from compelling him to be a witness against himself." Though the Court in *Boyd* held that compelling a person to be a witness against himself was tantamount to an unreasonable search and seizure, it never required a search and seizure to be independently unreasonable in order that it violate the Fifth Amendment. And though the several decisions which have found a Fifth Amendment violation stemming from a search and seizure all involved unreasonable search and seizures, it has never been established, contrary to the Court's assertion, *ante,* at 472, that the unlawfulness of the search and seizure is necessary to invoke the Fifth Amendment. *Gouled* v. *United States,* 255 U. S. 298 (1921), though also involving a Fourth Amendment violation, makes it clear that the illegality of the search and seizure is not a prerequisite for a Fifth Amendment violation. Under *Gouled,* a Fifth Amendment violation exists because the "[accused] is the unwilling source of the evidence," *id.,* at 306, a matter which does not depend on the illegality *vel non* of the search and seizure.[4]

Until today, no decision by this Court had held that the seizure of testimonial evidence by legal process did

---

[4] As the Court notes, *ante,* at 474, *Gouled* also observed that there is no special sanctity in papers rendering them immune from search and seizure. 255 U. S., at 309. The observation, however, was hedged with qualifications, see *ibid.,* and *Gouled* itself makes clear that this was only a general proposition inapplicable in the case of private papers. See *id.,* at 306.

not violate the Fifth Amendment. Indeed, with few exceptions,[5] the indications were strongly to the contrary. See, e. g., *United States* v. *Lefkowitz*, 285 U. S. 452, 465–467 (1932); *Weeks* v. *United States*, 232 U. S. 383, 397 (1914); *Hale* v. *Henkel*, 201 U. S. 43, 76 (1906).[6]   More

---

[5] The Court cites *Marron* v. *United States*, 275 U. S. 192 (1927), as one exception, that decision having permitted the seizure of business records during the search of an illegal liquor business. *Marron*, however, provides little, if any, foundation for the Court's view.   Though erring in the light of subsequent cases, the Court there did not view the business records as private papers or testimonial evidence.   Rather, the records were viewed merely as "a part of the outfit or equipment actually used to commit the offense."   *Id.*, at 199.   Moreover, the aspect of *Marron* upon which the Court relies was clearly overruled in *United States* v. *Lefkowitz*, 285 U. S. 452 (1932)—the ostensible effort in *Lefkowitz* to distinguish it from *Marron* notwithstanding.

The Court also cites *Abel* v. *United States*, 362 U. S. 217 (1960), as supporting its position that private testimonial papers may be seized without violating the Fifth Amendment.   The papers seized in that case, however, even if fairly characterizable as private and testimonial—a matter about which I have doubt—were not admitted for the purpose of utilizing their testimonial contents as evidence.

Finally, this Court's wiretapping cases also lend little support to the Court's position.   Two of those cases expressly recognized the danger to Fifth Amendment rights posed by wiretapping.   See *Berger* v. *New York*, 388 U. S. 41, 56, 62 (1967); *Osborn* v. *United States*, 385 U. S. 323, 329 n. 7 (1966).   All cases permitting seizure have involved conversations between two or more parties under other than what could be considered confidential circumstances.   Grave questions would be raised, however, where conversations are seized from the privacy of the home or where the conversations are between parties who speak at other than arm's length.   In such circumstances there is danger that the zone of privacy recognized by the Fifth Amendment will have been invaded.   See *Olmstead* v. *United States*, 277 U. S. 438, 471–479 (1928) (Brandeis, J., dissenting).

[6] Though one component of the rationale in these cases precluding the seizure of papers appears to be the "mere evidence" rule, which was repudiated in *Warden* v. *Hayden*, 387 U. S. 294 (1967), they also

recently, *Schmerber* v. *California,* 384 U. S. 757, 767 (1966), noted that the "values protected by the Fourth Amendment . . . substantially overlap those the Fifth Amendment helps to protect," and clearly indicated that in considering whether to suppress seized evidence, a first inquiry is whether its testimonial nature, if any, precludes its introduction in evidence. See *id.,* at 760–765. Subsequent to *Schmerber, Warden* v. *Hayden,* 387 U. S. 294, 302–303 (1967), carefully observed that the items of clothing seized in that case were "not 'testimonial' or 'communicative' in nature, and their introduction therefore did not compel respondent to become a witness against himself in violation of the Fifth Amendment." [7] These cases all reflect the root understanding of *Boyd* v. *United States,* 116 U. S., at 630: "It is not the breaking of his doors, and the rummaging of his drawers, that constitutes the essence of the offence [to the Fifth Amendment]; but it is the invasion of his indefeasible right of personal security, personal liberty

---

view such seizures as tantamount to the compulsion of testimony, an unlawful act conceptually distinct from the once unlawful act of seizing mere evidence. *United States* v. *Lefkowitz, supra,* at 466–467, for example, reiterates *Boyd*'s condemnation of the *compulsory* extraction of a man's private papers. Similarly, *Weeks* v. *United States,* 232 U. S., at 397, recognized that the seizure of a man's papers was an offense because it constituted the *compulsory* production of private papers. Accordingly, the doctrinal demise of the "mere evidence" rule left untouched the principles of these cases respecting the Fifth Amendment. See *Fisher* v. *United States,* 425 U. S. 391, 420–422, n. 5 (1976) (BRENNAN, J., concurring in judgment).

[7] By further observing that "[t]his case thus does not require that we consider whether there are items of evidential value whose very nature precludes them from being the object of a reasonable search and seizure," 387 U. S., at 303, *Hayden,* at the very least, clearly left open the question whether lawful seizure of testimonial evidence violated the Fifth Amendment.

and private property . . . . [A]ny forcible and compulsory extortion of a man's own testimony or of his private papers to be used as evidence to convict him of crime . . . , is within the condemnation of [the Amendment]. In this regard the Fourth and Fifth Amendments run almost into each other."

## II

Even if a Fifth Amendment violation is not to be recognized in the seizure of petitioner's papers, a violation of Fourth Amendment protections clearly should be, for the warrants under which those papers were seized were impermissibly general. General warrants are especially prohibited by the Fourth Amendment. The problem to be avoided is "not that of intrusion *per se,* but of a general, exploratory rummaging in a person's belongings." *Coolidge* v. *New Hampshire,* 403 U. S. 443, 467 (1971). Thus the requirement plainly appearing on the face of the Fourth Amendment that a warrant specify with particularity the place to be searched and the things to be seized is imposed to the end that "unauthorized invasions of 'the sanctity of a man's home and the privacies of life' " be prevented. *Berger* v. *New York,* 388 U. S. 41, 58 (1967). " 'As to what is to be taken, nothing is left to the discretion of the officer executing the warrant.' " *Stanford* v. *Texas,* 379 U. S. 476, 485 (1965) (quoting *Marron* v. *United States,* 275 U. S. 192, 196 (1927)).

The Court recites these requirements, but their application in this case renders their limitation on unlawful governmental conduct an empty promise. After a lengthy and admittedly detailed listing of items to be seized, the warrants in this case further authorized the seizure of "other fruits, instrumentalities and evidence of crime at this [time] unknown." App. A. 96, A. 115. The Court construes this sweeping authorization to be

limited to evidence pertaining to the crime of false pre-
tenses with respect to the sale of Lot 13T. However,
neither this Court's construction of the warrants nor the
similar construction by the Court of Special Appeals of
Maryland was available to the investigators at the time
they executed the warrants. The question is not how
those warrants are to be viewed in hindsight, but how
they were in fact viewed by those executing them. The
overwhelming quantity of seized material that was either
suppressed or returned to petitioner is irrefutable testi-
mony to the unlawful generality of the warrants.[8]  The
Court's attempt to cure this defect by *post hoc* judi-
cial construction evades principles settled in this Court's
Fourth Amendment decisions. "The scheme of the
Fourth Amendment becomes meaningful only when it
is assured that at some point the conduct of those
charged with enforcing the laws can be subjected to
the more detached, neutral scrutiny of a judge . . . ."
*Terry* v. *Ohio,* 392 U. S. 1, 21 (1968). See *Berger*
v. *New York, supra,* at 54; *Johnson* v. *United States,*
333 U. S. 10, 13–14 (1948). It is not the function of
a detached and neutral review to give effect to warrants
whose terms unassailably authorize the far-reaching
search and seizure of a person's papers, especially where
that has in fact been the result of executing those
warrants.

MR. JUSTICE MARSHALL, dissenting.

I agree with MR. JUSTICE BRENNAN that the business
records introduced at petitioner's trial should have been
suppressed because they were seized pursuant to a
general warrant. Accordingly, I need not consider

---

[8] Testimony by investigators at the suppression hearing requested
by the petitioner indicates that seizure of many of his papers
occurred indiscriminately. See App. A. 155, A. 156.

whether petitioner's alternative contention—that the Fifth Amendment precludes the seizure of private papers, even pursuant to a warrant—can survive *Fisher* v. *United States,* 425 U. S. 391 (1976), and, if so, whether this Fifth Amendment argument would protect the business records seized in this case.