**UNITED STATES of America,
Plaintiff-Appellant,**

v.

**The OFFICES KNOWN AS 50 STATE
DISTRIBUTING CO.,
Defendant-Appellee.**

**No. 82–5671.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 16, 1983.

Decided May 25, 1983.

Rehearing Denied July 6, 1983.

Joel M. Gershowitz, Washington, D.C., Lamond R. Mills, U.S. Atty., Brian L. Sullivan, Asst. U.S. Atty., Las Vegas, Nev., for plaintiff-appellant.

Annette R. Quintana, Oscar Goodman, Las Vegas, Nev., for defendant-appellee.

Before MERRILL, CHOY and SNEED, Circuit Judges.

MERRILL, Circuit Judge.

The United States appeals from the District Court's order granting a motion by Appellee 50 State Distributing Co., for the return of improperly seized property, pursuant to Rule 41(e), F.R.Crim.P. The search in question was executed by agents of the United States Postal Service on October 19, 1981, pursuant to a warrant, and resulted in virtually all of 50 State's business records being seized.

## FACTS

On October 19, 1981, following several weeks of investigation, the United States Postal Service obtained a warrant from a United States Magistrate authorizing the search of 50 State's place of business in Las Vegas, including "all persons" on the premises. The warrant authorized the seizure of certain property, as follows:

> lead source material, invoices, sales orders, order forms, books, records (magnetic or typewritten), ledgers, correspondence, pitches (written or taped), typewriters, premiums, gifts, supplies, and/or merchandise, United States Postal Service Money Orders, United States Postal Service C.O.D. firm mailing records, and other evidence and instrumentalities for numerous on-going violations of Title 18, United States Code, Sections 1341 (Mail Fraud), 1342 (Fictitious Names) and 371 (Conspiracy).

The warrant was based on and incorporated the affidavit of Postal Inspector Wayne E. Gray. The affidavit described 50 State as a national supplier of advertising specialty products such as ball point or felt tip pens, key chains and calendars, all bearing the name and advertising message of the purchaser. It described 50 State's business as directed at small businesses nationwide and a "boiler room" sales operation which engaged in fraud and misrepresentation in selling its promotional merchandise. Gray's affidavit was 27 pages in length and was based in part upon information supplied by a private investigator who gained employment for a time with 50 State; by brand name manufacturers that 50 State

falsely claimed to represent; and by several victims of 50 State's fraudulent conduct.

According to the affidavit, the private investigator had been enrolled in a one-week training course where he had been instructed by an officer of 50 State in the techniques of successful selling of the company's merchandise. The private investigator had observed and overheard seven or more of the company's salesmen at work and reported in detail on his observations. He stated that it was the general practice of the salesmen to telephone prospective customers and inform them that they had been selected to receive a gift, such as a diamond, money clip, steak knife set, perfume, or Betamax recorder. The salesman would then inform the prospect that in order to receive the free gift or to be eligible for another drawing he would have to purchase some of the advertising specialty products. The salesman would claim to have for sale brand name, high-quality merchandise which he would send to buyers through the mail C.O.D. The merchandise was in fact of shoddy quality and the gifts either did not materialize or were substantially worthless.

The affidavit contained the following statement:

I have investigated similar patterns of conduct as described in this affidavit for the past four years. I have also investigated other types of schemes for the past ten years. I have participated in ten business searches involving similar type schemes. It has been my experience that employees carry "lead source" material in and out of these "boiler rooms" in their briefcases, sacks, purses or on their person. In the past, they have attempted to conceal material damaging to themselves, on their person, or leave with this material when allowed to vacate the premises.

It concludes with affiant's statement of his opinion as follows:

It is my belief that 50-State Distributing Company, Inc., et al., 3044 South Highland Drive, Las Vegas, Nevada, 89102, is at the present time executing a scheme and artifice to defraud and to obtain money and property from businesses and various other organizations by means of false and fraudulent pretenses, to wit: that business owners have been selected by computer, and have won gifts such as diamonds, playboy money clips, etc., and may purchase high-quality name brand pens, calendars, etc., at low prices, and that the C.O.D. packages and returned U.S. Postal Money Orders to and from said businesses and organizations have been mailed or received by 50-State Distributing et al, and that this scheme is being conducted by persons known and unknown on the premises described herein, wherein "pinks," lead source material, invoices, sales orders, order forms, books, records, ledgers, correspondence, pitches (written or taped), typewriters, premiums, gifts, supplies and/or merchandise, United States Postal Service Money Orders, United States Postal Service C.O.D. firm mailing records, and other evidence and instrumentalities of numerous ongoing violations of Title 18, U.S.Code, Section 1341 (Mail Fraud), Title 18, United States Code, Section 1342 (Fictitious Names) and Title 18, United States Code, Section 371 (Conspiracy) are to be found.

At or about 9:00 a.m. on October 20, 1981, 43 agents of the Postal Service and several Las Vegas police officials entered the premises of 50 State and executed the search warrant. At least 300 employees of 50 State were present, plus at least two visitors. Local police officers helped secure the entrances and exits to the building. The Postal Inspectors required all persons to remain seated at their desks or in their respective work areas. No one was permitted to leave the premises or, without an escort, to go to the restroom.

The Inspectors required each person on the premises to fill out an identification form and that each person be photographed before the individual was permitted to leave. Those who did not have proper identification were required to remain in a holding area until their identity could be checked with the Nevada Department of Motor Vehicles. One employee, Donna

Hara, was told that failure to fill out the identification form could result in further detention or arrest. Some employees asked to telephone their attorneys, but the Inspectors refused until the search was concluded. Another employee without proper identification, Margaret Campbell, was taken to the restroom by a female agent who searched her slip and brassiere (which search the District Court termed a "strip search".)

During the search the Postal Inspectors seized business items, such as tape recorders, tapes, merchandise, stationery, business forms, files, and envelopes, as well as some personal items, including family pictures, foreign coins, cash, personal papers, and Christmas toys for an employee Christmas party. Some quantities of documents were seized after only spot checks as to their relevance. Materials were hauled away by vans. Also during the course of the search the door to the records room was broken down following several unsuccessful attempts to locate the key. The Inspectors also damaged 50 State's Lektriever, an automatic filing machine.

On motion by 50 State under Rule 41(e), F.R.Crim.P., the District Court on April 7, 1982, ordered the government to return the seized property, concluding that the search warrant was a "general warrant" which failed to satisfy the Fourth Amendment's requirement of particularity as to the items to be seized and the persons to be searched, and that the execution of the warrant was unconstitutional in that the Inspectors ran "roughshod" over the constitutional rights of 50 State and some of its employees.

The government has taken this appeal.

## VALIDITY OF THE WARRANT

■ The Fourth Amendment requires that for a warrant to be valid, it must "particularly describ[e] the place to be searched, and the persons or things to be seized." This particularity requirement makes "general searches under [a warrant] impossible and prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to

the discretion of the officer executing the warrant." *Marron v. United States,* 275 U.S. 192, 196, 48 S.Ct. 74, 76, 72 L.Ed. 231 (1927); *see Andresen v. Maryland,* 427 U.S. 463, 480, 96 S.Ct. 2737, 2748, 49 L.Ed.2d 627 (1976); *United States v. Williams,* 687 F.2d 290, 292 (9th Cir.1982); *United States v. Cardwell,* 680 F.2d 75, 77 (9th Cir.1982); *United States v. Hillyard,* 677 F.2d 1336, 1339 (9th Cir.1982).

In this case the government argues that the search warrant met the particularity requirement. It argues, first, that the warrant sufficiently removed discretion from the executing officers in that the warrant essentially authorized the seizure of *all* the business-related books, records, equipment and merchandise on Appellee's premises. Second, it argues that the breadth of the warrant was justified by the breadth of probable cause in view of Inspector Gray's affidavit. It argues that Gray's affidavit evidenced a pervasively fraudulent operation which encompassed the entire business and therefore *all* business-related books, records, and equipment constituted instrumentalities of fraud which the Inspectors were properly directed to seize.

We agree. The warrant left the executing officers with no discretion. While the seizure was extraordinarily broad, and in that sense "general", under the particular facts of this case the scope of the warrant was justified. It was not possible through more particular description to segregate those business records that would be evidence of fraud from those that would not, for the reason that there was probable cause to believe that fraud permeated the entire business operation of 50 State.

In *United States v. Brien,* 617 F.2d 299 (1st Cir.), *cert. denied,* 446 U.S. 919, 100 S.Ct. 1854, 64 L.Ed.2d 273 (1980), the court upheld a search under a broad warrant of the premises of a company believed to be engaged in the fraudulent sale of commodities options. The court noted that although various government agencies had received 250 complaints from the commodities business contacts, the government's probable cause was not limited to evidence as to

those complaints, because it could be fairly inferred that the 250 complaints were just "the tip of the iceberg". *Id.* at 308. The court concluded that the facts presented to the magistrate indicated that the commodities operation was entirely a scheme to defraud. *Id.* The court distinguished those cases where the suspected crime may have been evidenced in segregable records, *id.* at 309 n. 11, and held that "where there is probable cause to find that there exists a pervasive scheme to defraud, *all* the business records of an enterprise may be seized, if they are, as here, accurately described so that the executing officers have no need to exercise their own judgment as to what should be seized." *Id.* at 309 (emphasis supplied). *See also United States v. Cortellesso,* 601 F.2d 28, 32 (1st Cir.1979) (facts in affidavit supported warrant in generic terms where facts indicated that stolen goods constituted dominant part of goods on searched premises), *cert. denied,* 444 U.S. 1072, 100 S.Ct. 1016, 62 L.Ed.2d 753 (1980); *United States v. White,* 541 F.Supp. 1181, 1186 n. 2 (N.D.Ill.1982) (dicta).

In *National City Trading Corp. v. United States,* 635 F.2d 1020, 1026 (2d Cir.1980), the court noted that because "there was probable cause to believe that NCTC's business was permeated with fraud .... the agents could properly seize all of the business records of NCTC described in the warrant".

The cases upon which 50 States relies are distinguishable. In those cases, although the courts struck down a warrant as an impermissible general warrant, the warrant allowed widespread seizure of business records while the suspected wrongdoing supporting the warrant pertained only to small segments of the operations of the searched business. In those cases the evidence of fraud was segregable. *United States v. Abrams,* 615 F.2d 541 (1st Cir.1980); *United States v. Roche,* 614 F.2d 6 (1st Cir.1980); *Application of Lafayette Academy,* 610 F.2d 1 (1st Cir.1979). Nor is our decision inconsistent with *United States v. Cardwell,* 680 F.2d 75 (9th Cir.1982), in which we invalidated a warrant directing the authorities to seize "corporate books and records ... which are the fruits and instrumentalities, of violations of 26 U.S.C. § 7201." *Id.* at 76. Because the only limitation in the *Cardwell* warrant on the search was that the seized items be evidence of the tax evasion statute, we held the seizure invalid. In *Cardwell,* however, the government's investigation had already focused on certain parts of the defendant's business records. *Id.* at 78. In this case, however, no such focused search was possible because the affidavit indicated that the entire 50 State operation was fraudulent.

As to the search of persons as well as premises, the affidavit provided probable cause to believe that evidence that 50 State was guilty of crime was to be found concealed on the persons of employees present at the premises to be searched. No individual employee, however, was named or singled out for search. The affidavit makes no effort to show probable cause that any particular individual was in possession of evidence. The theory on which the agents proceeded apparently was that there was probable cause to suppose, because of the nature of his employment, that *every* person on the premises was an employee and might be in possession of evidence. Inspector Gray noted in the affidavit that, in his experience, "boiler-room" employees often conceal evidence on their persons. In our view, the affidavit falls short of supporting the assumption that all the employees may have been in possession of evidence. It may be argued that under these circumstances evidence obtained from a search of individuals is subject to suppression. The government contends, however, that a warrant to search persons identified only by their location at a specific location is unobjectionable so long as there is probable cause to believe that anyone present might have on his person an item that is an object of the search. *See Ybarra v. Illinois,* 444 U.S. 85, 90 n. 2, 92 n. 4, 100 S.Ct. 338, 342 n. 2, 342 n. 4, 62 L.Ed.2d 238 (1979). This issue (together with the question of standing to raise it) we do not reach for the reason that it is not the issue before us. The issue before us is whether, by its scope, the warrant was invalid as a general warrant rendering all that was seized under the warrant subject to return. If probable

cause was lacking as to the search of individuals, that does not operate to render the warrant itself invalid in its entirety as a general warrant. The remedy is not a return of all items seized but selective suppression or return of the items improperly seized. *Cf. United States v. Cardwell,* 680 F.2d 75, 78–79 (9th Cir.1982) (approving partial suppression remedy as to improper warrant); *see also Andresen v. Maryland,* 427 U.S. at 482 n. 11, 96 S.Ct. at 2749 n. 11.

We conclude that the warrant was not invalid as a general warrant and that the seizure was not rendered invalid by virtue of its scope.

## VALIDITY OF THE EXECUTION OF THE WARRANT

██ Here we are concerned not with the scope of the warrant or seizure but with the manner in which the warrant was executed and the seizure carried out. The District Court in its order stated that "it seems clear that the government ran roughshod over the constitutional rights of the plaintiffs and of the employees."

The Court did not specify any act as a civil rights violation nor has there been any attempt by 50 State to assert standing on its part to complain of any particular intrusion on the privacy of its employees or to connect any particular violation with evidence obtained by virtue of that violation. The contention of 50 State appears to be that the manner of execution of the warrant in its entirety was so offensive as to render the whole of the search and seizure unreasonable under the Fourth Amendment.

No authority is cited for this proposition nor is any standard suggested for determining when its application is proper. There may be justification for such a rule in extreme cases where there is no apparent justification for oppressive conduct. *Cf. Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952) (outrageous conduct by law enforcement agents in ordering a stomach pump "shock[ed] the conscience" and justified setting aside conviction on due process grounds); *Leiterman v. Rushen,* 704 F.2d 442 (9th Cir.1983) (dicta) ("outrageous

and shocking conduct by law enforcement agents might so infect a conviction with deprivation of constitutional rights that the conviction will be set aside on due process grounds" but conduct must be causally related to conviction; no such connection found). We do not find this to be such a case.

The breadth of the warrant (which we have held to be justified) rendered the execution of the warrant a most difficult task at best. Some control over the 300 50 State employees was necessary for an orderly search. If some seized items were not business-connected, if some property damage resulted, if some persons suffered unnecessary humiliation, a remedy in each instance is available, specifically designed to meet the specific offense. Considering the magnitude of the task, we cannot, from what we find in the Record, regard the search and seizure as so unduly oppressive or executed with such undue disregard of personal amenity as to shock the judicial conscience and render the search invalid in its entirety.

We conclude that the manner of the execution of the warrant does not render the seizure invalid.

REVERSED AND REMANDED with directions that the Order of April 7, 1982, be vacated and set aside.