UNITED STATES of America, Plaintiff,

v.

Anthony "Tony" DEFALCO et al., Defendants.

UNITED STATES of America, Plaintiff,

v.

Kenneth GUARINO et al., Defendants.

UNITED STATES of America, Plaintiff,

v.

Louis "Butchie" PERAINO et al., Defendants.

UNITED STATES of America, Plaintiff,

v.

Roland BOUDREAULT et al., Defendants.

UNITED STATES of America, Plaintiff,

v.

Norman "Norm" ARNO et al., Defendants.

UNITED STATES of America, Plaintiff,

v.

Theodore "Teddy" GASWIRTH et al., Defendants.

UNITED STATES of America, Plaintiff,

v.

John BELMONT et al., Defendants.

UNITED STATES of America, Plaintiff,

v.

Leo WEINTRAUB, Defendants.

UNITED STATES of America, Plaintiff,

v.

Phillip Charles BERNSTENE et al., Defendants.

UNITED STATES of America, Plaintiff,

v.

Rubin STURMAN et al., Defendants.

UNITED STATES of America, Plaintiff,

v.

Ray HIND et al., Defendants.

UNITED STATES of America, Plaintiff,

v.

Robert DI BERNARDO et al., Defendants.

UNITED STATES of America, Plaintiff,

v.

Louis "Lou" GUGLIELMI, Defendant.

UNITED STATES of America, Plaintiff,

v.

Walter BAGNELL, Defendant.

UNITED STATES of America, Plaintiff,

v.

Noel BLOOM et al., Defendants.

UNITED STATES of America, Plaintiff,

v.

Joseph ARIENO et al., Defendants.

Nos. 80–56–Cr–EPS (S1–16).

United States District Court, S. D. Florida, Miami Division.

Feb. 19, 1981.

Fred A. Schwartz and Marcella Cohen, U. S. Dept. of Justice, Miami, Fla., for plaintiff.

Todd C. Lyster, Chicago, Ill., for defendants Defalco and Gorman.

William E. Seekford, Towson, Md., for defendant Guarino.

John F. Sheehan, Providence, R. I., for defendants Renzi and DiBona.

Henry J. Boitel, New York City, for defendants Louis Peraino, Joseph Peraino, Balsamo, De Stephano, and Himmelstein.

Robert E. Smith, Encino, Cal., and Rebekah J. Poston, Miami, Fla., for defendants Boudreault, Nelson, Bernstene, Mohney, and Belmont.

Elliot J. Abelson, Beverly Hills, Cal., for defendants Arno, Bernback, Sinopoli, Sarnblad, and Gaswirth.

Gerald W. Werksman, Chicago, Ill., for defendant Weintraub.

Stephen J. Finta, Fort Lauderdale, Fla., for defendant Jackmore.

Joel Kaplan, Miami, Fla., for defendant Burns.

Bernard Berkman, Cleveland, Ohio, for defendant Sturman.

Arthur M. Schwartz, Denver, Colo., for defendants Zernic and Assid.

David Hinden, Beverly Hills, Cal., for defendant Hind.

Anthony M. Glassman, Beverly Hills, Cal., for defendant Tapper.

Herald Price Fahringer, Buffalo, N. Y., for defendants DiBernardo and Rothstein.

Ralph J. Schwarz, Jr., New York City, for defendant D'Apice.

Burton Sandler, Towson, Md., for defendant Guglielmi.

Roger Jon Diamond, Pacific Palisades, Cal., for defendant Bagnell.

John H. Weston, David M. Brown, Robert Sarno, Brown, Weston & Sarno, Beverly Hills, Cal., for defendants Noel Bloom, Al Bloom, Summers, Mallen, and Chan.

Corey E. Hoffman, Miami, Fla., for defendant Arieno.

Michael Klein, Los Angeles, Cal., for defendant Zeichick.

Robert M. Leen, Hollywood, Fla., for defendant Mathes.

Humberto Aguilar, Miami, Fla., for defendant Wade.

## MEMORANDUM OPINION AND ORDER GRANTING MOTIONS TO SUPPRESS

SPELLMAN, District Judge.

### I. HISTORY

THIS CAUSE is before the Court on the Motions to Suppress filed by several defendants in the above-styled indictments. At stake is the evidence seized pursuant to search warrants in the coordinated post-indictment searches of twenty-one (21) business offices across the country in the "Miporn" obscenity conspiracy case, # 80–56–Cr–EPS.

A brief look at the procedural history of the searches and the defendants' challenge to their validity reveals the following. After a two and one-half year undercover F.B.I. investigation of major national distributors of sexually explicit films and magazines, involving the solicitation of interstate transportation of allegedly obscene material, the government presented its case to grand jury 79–4 in the Southern District of Florida. The grand jury returned an indictment charging forty-five (45) defendants in one count of conspiracy to commit interstate transportation of obscene material. In the overt acts listed under count one and in the seventeen substantive counts involving small groups of the defendants, the indictment listed as obscene, lewd, lascivious and filthy approximately one hundred (100) films and thirty (30) magazines, with titles such as *Deep Throat* and *Dog Sex*.[1]

The indictment was returned on February 12, 1980. On the following day, affidavits in support of search warrants were filed in New York, Chicago, Los Angeles, San Francisco, Baltimore, Cleveland, and Fort Lauderdale. Each affidavit had a common section which set forth some of the features of the F.B.I.—Miporn investigation. Each affidavit also contained a different element, a detailed reference to the activities of the specific defendants and businesses named in the warrant. All the affidavits stated that a federal indictment had been returned charging the single conspiracy count and seventeen substantive counts.[2] The warrant applications sought authorization to seize a) certain of the films named in the indictment; b) "business records pertaining to the purchase, production, sales, transportation, receipts, disbursement, inventory, and other records of a similar nature regarding" the named films; and c) "correspondence, telephone records, and business records pertaining to the purchase, production, sales, transportation, receipts, disbursements, inventory and other records of a similar nature *which reflect the interrelationship and conspiracy between the following individuals and companies,*" (emphasis added) listing the forty-five (45) indicted defendants and nineteen (19) unindicted companies. Authorization to take photographs of the search operations was also requested.

All of the search warrants applied for were signed and issued by U.S. Magistrates in the respective districts in which the searches were to be conducted.[3] None of the authorizing magistrates actually viewed the allegedly obscene motion pictures, eight-millimeter films and magazines, nor was any evidence of the single, overall conspiracy presented to the magistrates.

The F.B.I. conducted all of the searches simultaneously across the country on February 14, 1980, in some cases taking two days to seize the thousands of business records and other papers which the agents deemed to reflect the interrelationship and conspiracy among the named defendants and companies.

1. [Matter omitted for purposes of publication.]

2. [Matter omitted for purposes of publication.]

3. [Matter omitted for purposes of publication.]

At the search of each business premises, one of the F.B.I. agents present served as team leader, rechecking seizures made by other agents to insure that the limits of the warrant were not exceeded by the breadth of the search. Despite this double-check procedure, in at least one search, that of Arrow Films and Video, a large percentage of the papers seized were not within the parameters of the warrant and were suppressed by agreement of the parties. Inventories of the seized items were made out and returned to the defendants, and the seized material was sent to the Southern District of Florida where it remains.

## II. MOTIONS TO SUPPRESS

The defendants have filed, under Federal Rule of Criminal Procedure 12(b), motions to suppress physical evidence seized in violation of their rights under the First, Fourth, and Fifth Amendments to the Constitution of the United States. The following grounds are alleged:

(1) the search warrant was a general warrant due to overbroad descriptions of the things to be seized and insufficient descriptions of the places to be searched;

(2) there was no probable cause for the issuance of the warrant because: (a) there was no prior scrutiny by an impartial magistrate of the allegedly obscene materials and (b) the finding of obscenity by the grand jury was an insufficient basis for probable cause as was the grand jury's finding as to the single conspiracy, there being no other information in the affidavits to provide probable cause of those essential elements;

(3) the defendants were deprived of their right to a prior adversary hearing on the obscenity *vel non* of the films and magazines;

(4) the execution of each search was overbroad in that things not covered by the warrants were seized, and the searches were roving and exploratory;

(5) the search of personal papers amounted to testimonial compulsion;

(6) illegal and discriminatory conduct of the government's undercover agents provided the basis for obtaining the warrants;

(7) one search was based on information obtained in a prior unconstitutional search;

(8) there were intentional misrepresentations in the affidavits;

(9) there was a violation of rights accruing to the defendants from a restraining order issued by the U.S. District Court for the Southern District of Florida which required the Broward County Sheriff's Office to circulate a list of all films considered by the Sheriff to be obscene; and

(10) the shifting composition of the grand juries in Dade County make it inevitable that any finding of obscenity made by a grand jury will have the effect of an ex post facto law since the relevant community standards change over time.

This Court referred the motions to suppress to Magistrate Palermo for the limited purpose of evaluating the execution of the searches by the F.B.I. agents to determine if the searches exceeded the scope of the warrant. An evidentiary hearing was held by the magistrate in September 1980 at which testimony was taken concerning the execution of the searches. The magistrate recommended to this Court that it deny the motions with regard to the sole issue referred to him, finding that none of the searches exceeded the authorization of the warrants. All of the defendants filed timely appeals to the magistrate's findings and recommendations.

This Court heard arguments on the suppression issues in the hearings on the original indictment during the week of September 23–26, 1980. On October 15, 1980, the government announced that the grand jury had returned sixteen superseding indictments in the Miporn case, eliminating the single conspiracy count which had bound all of the defendants together. The government also announced to the Court that the government would not attempt to introduce into evidence in any of the cases the films and magazines seized in the searches.

On November 6, 1980, the Court ordered that all defendants who wished to make their previous motions applicable to the new indictments had until December 6, 1980 to make specific adoptions. The Court is treating all the motions to suppress as viable and properly before the Court, whether or not they were later specifically adopted in writing, unless the defendant has specifically waived said motion. The Court accepts the government's representation that it will not use in its case in chief any films or magazines seized; thus, the Court will not treat those items in this suppression order.

## III. FINDINGS AND CONCLUSIONS

The Court hereby adopts the factual findings made by the magistrate in his recommendations to the Court. Thus, the Court finds that the execution of the searches did not so substantially exceed the scope of the warrant as to invalidate any of the searches. Specific items which exceed the warrant may be suppressed at such time as the government seeks to introduce them in evidence.

Concerning the remaining grounds for suppression raised by the defendants, the strongest arguments favoring suppression are the first two on the list above: (1) overbreadth of the warrants and (2) no probable cause for their issuance.

### A. OVERBREADTH

With regard to their contention of overbreadth, the defendants challenge two parts of the warrant, that which authorizes seizure of records pertaining to interstate shipment of films named in the indictment (substantive counts II to XVIII) and that relating to records which reflect the conspiracy (count I.)

### 1. SUBSTANTIVE RECORDS

The section of the warrant describing papers to be seized because they pertain to named obscene films is quoted *supra*, at p. 130, see sub. (b). It is similar to the language approved by the Fourth Circuit in *United States v. Torch*, 609 F.2d 1088 (4th

Cir. 1979), and by the Ninth Circuit in *United States v. Jacobs*, 513 F.2d 564 (9th Cir. 1974). This part of the warrant narrowly focuses on those papers which are part of transactions involving the specific films in the indictment.

*Jacobs* approved a warrant authorizing seizure of "documents pertaining to the interstate shipment of obscene materials," specifying a list of certain types of documents. *Id.* at 567. *Torch* found permissible a warrant calling for the seizure of "records, documents, and writings related to the transportation, sale and distribution in interstate commerce of" certain films, "including route book, cash sales slips, credit memos, and other similar type documents." 609 F.2d at 1089. Under *Torch*, the language of the "transaction" section of the present warrants "falls within the practical margin of flexibility." *Id.* at 1090. Thus, the "substantive records" should not be suppressed on the ground the warrant was overbroad.

### 2. REFLECTION OF CONSPIRACY RECORDS

Turning to the "reflection of conspiracy" section of the warrant, the defense contention is that the warrants' authorization of the seizure of "letters, correspondence, telephone records and business records pertaining to the production, sales, transportation, receipts, disbursements, inventory and other records of a similar nature *which reflect the interrelationship and conspiracy between the following individuals and companies,*" (emphasis added) the forty-five (45) defendants and nineteen (19) companies, is so broad as to give the searching officers no clear guidance on what they could and could not seize. Thus, the warrants violated the Fourth Amendment guarantee that warrants shall describe with particularity the place to be searched and things to be seized, urge the defendants.

The defendants' argument is not complex. It is contended that the above-quoted phrase placed no meaningful limits on the searching authority of the F.B.I. at the

business offices of the nineteen named companies which distributed sexually oriented films and magazines. In essence, the warrants left the agents free to seize whole ledger books and file drawers, any book or paper mentioning the name of a company or defendant named in the warrant. In large measure, this view is borne out by the execution of the searches by the F.B.I. The sheer number of books, ledgers, files and other papers taken by the agents reinforces this conclusion. In reviewing the fruits of the search, this Court is hard-pressed to delimit which of the seized items do and which do not fall within the scope of the warrant; so much may be said to "reflect" an interrelationship between companies and/or defendants.

The government contends that *Andresen v. Maryland,* 427 U.S. 463, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976), approves the type of language used in the present search warrant. The Supreme Court there stated that the addition of the phrase "together with other fruits, instrumentalities and evidence of crime at this time unknown" to an exhaustive list of particularly described documents, where it was clear that the search was limited to evidence of a specific land fraud involving a specific piece of property was sufficient particularization under the Fourth Amendment.

The defendants respond that even under an expansive view of *Andresen* these search warrants were overbroad. Under *Andresen,* the first responsibility of this Court is to determine what is the crime alleged for which evidence was sought under the assertedly overbroad search warrant. *Id.* at 480, 96 S.Ct. at 2748. That is what this Court set out to do in the September 23–26, 1980 hearings on the original indictment. Before the Court had reached a determination, the government had obtained superseding indictments.

Clearly, the alleged crime is a single conspiracy involving the interstate shipment of obscene material. The problem comes in describing the nature of the conspiracy and in specifying the particular state lines to be crossed by particular films and the particular times the conspiracy was in operation.

The government filed with the Court a document entitled "Government's Factual Presentation of the Conspiracy." That document was one hundred fifteen (115) pages in length. It recounted conversations and transactions between undercover agents and various defendants from 1977 to 1980, but in no way did the presentation tie the events together in such a way as to meaningfully elaborate the conspiracy alleged. Upon review of the record, it becomes immediately apparent that attempting to define this alleged conspiracy is purely a speculative diversion. No matter how one chooses to define the conspiracy, it is unquestionable that not all records which "reflect the interrelationship" between the defendants and companies are evidence of the single conspiracy alleged in the indictment.

One answer to the Court's difficulty with vagueness of the crime alleged is for the government to say that it is the general and pervasive nature of the defendants' crime which mandates the authorization of such a broad and sweeping warrant. However, the Fourth Amendment bears no *per se* exception to the particularization requirement for expansive and ill-defined conspiracies. The critical question remains whether or not the warrant placed a meaningful restriction on the authority of the government to seize documents and records belonging to the defendants. It is a close question.

There are no Fifth Circuit cases directly covering this fact situation. *United States v. Davis,* 589 F.2d 904 (5th Cir. 1979), cert. denied 441 U.S. 950, 99 S.Ct. 2178, 60 L.Ed.2d 1055, added an interpretation to *Andresen* to authorize general language in a search warrant.

> When exact description of the objects of the search is a "virtual impossibility," however, "the searching officer can only be expected to describe the generic class of items he is seeking." *James v. United States,* 416 F.2d 467 (5th Cir. 1969), cert. denied 397 U.S. 907, 90 S.Ct. 902, 25 L.Ed.2d 87.

589 F.2d at 906.

The search warrant in *Davis* authorized the seizure of "white string, brown paper

and corrugated paper," since investigators had found many remnants of such items at the scene of an explosion which was the crime being investigated. The Fifth Circuit held that there was no need for a chemical investigation of the paper before it was seized, but that the generic class of the items searched for was sufficiently narrow to guide the discretion of the searching officers. Very clearly, the Fifth Circuit was guided by the nature of the crime being investigated, the mailing of an explosive device with intent to murder. The items sought, brown and corrugated paper and string, were alleged to be direct evidence of this crime, and the generic class they represented was stationery materials or packaging materials which could be used for mailing an explosive device.

The *James* case cited by the *Davis* Court authorized a search for "gambling paraphernalia ... including ... records, sales receipts, customers' lists, shipping orders ..." The Fifth Circuit stated that "the items to be searched were as precisely identified as the nature of the activity permitted." 416 F.2d at 473. This language should not lightly be applied to a blanket warrant covering papers evidencing a vague conspiracy. Moreover, it is far from apparent that the nature of the activity in the present case did not permit a more particular description of the items to be seized.

It would be difficult to label the records, correspondence and documents searched for in the present case a generic class of items sufficiently narrowed to a crime or criminal enterprise to justify approval under the *Davis-James* rationale.

The present case is distinguishable from one in which the warrant authorizes the seizure of stolen guns, drugs, counterfeit money, gambling paraphernalia, or even records pertaining to a specific sale of land, as in *Andresen*, or records pertaining to transactions involving a film as in *Torch, supra*. Here, the warrants authorized searches and seizures of any writings which reflected an "interrelationship" among dozens of defendants and companies.

The government reiterates its citation of *Torch, supra*, and *Jacobs, supra*, with regard to this aspect of the warrant. Clearly, those cases did not involve conspiracies and interrelationships of defendants and companies. The document searches authorized in those cases related to specific transactions concerning named obscene films. "The documents to be seized were those related to the transactions Torch entered into during his brief trip to West Virginia." 609 F.2d at 1090. In *Jacobs*, the search covered a transaction involving a single film.

The District of Columbia Circuit held in *In re Search Warrant*, 572 F.2d 321 (1977), cert. denied 435 U.S. 925, 98 S.Ct. 1491, 55 L.Ed.2d 519, that authorization of a search for any evidence of conspiracies to steal government property was not general when read in conjunction with the supporting affidavit which specifically listed and described the documents evidencing the specific conspiracies. The Court rejected the notion that there is nothing "particular" about conspiracy, and stated that "*the two conspiracies here specified were described in great particularity*." (Emphasis added). Thus, "the supporting documents went into great particularity not only as to the relevant documents and their location but also as to the particular offenses that the property sought was designed to prove." 572 F.2d at 326.

In the present case, although the supporting affidavit is substantial and offers numerous facts to connect several of the codefendants as traffickers in sexually explicit films and magazines, the conspiracy itself is not defined with such particularity in the affidavits or in the indictment as to insure that the scope of the warrant would not be exceeded by the decisions made on the scene by the searching officers. Moreover, the affidavit does little or nothing to specify what documents and records are to be seized. Not a single document is named in the warrants or the affidavits, nor is any one document described with any particularity in either the warrants or the affidavits. Instead, the warrants authorized a search for any connection between the nu-

merous defendants and companies. *Cf. Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319, 325, 99 S.Ct. 2319, 2324, 60 L.Ed.2d 920 (1979).

The defendants contend that the searches invaded their constitutionally protected associational rights, citing *Stanford v. Texas*, 379 U.S. 476, 85 S.Ct. 506, 13 L.Ed.2d 431 (1965). In disallowing a search "for books, records, pamphlets, cards, receipts, lists, memoranda, pictures, recordings and other written instruments concerning the Communist Party of Texas," the Supreme Court stated that the "point is that it was not any contraband ... that was ordered to be seized, but literary [and related] material ...." *Id.* at 486, 85 S.Ct. at 512. The distinction between *Stanford* and the present case is that the former involved personal papers and political papers, while the latter involved business records and material of sexual content. The Court finds that business records have a somewhat lower place in the Fourth Amendment scheme than personal papers, however, these records were all presumably related to materials which bear a presumption of protected status under the First Amendment. Thus, the statements in *Stanford* should not lightly be discounted, despite *Stanford*'s caution against extending the protection afforded to business records.

> The word "books" in the context of a phrase like "books and records" has, of course, a quite different meaning. A "book" which is no more than a ledger of an unlawful enterprise thus might stand on a quite different constitutional footing from the books involved in the present case.

*Id.* at 485, n. 16, 85 S.Ct. 512, n. 16. In the present case, the government does not contend that the ledgers and other records seized are no more than ledgers "of an unlawful enterprise." The government has no basis to contend that the bulk of the business done by the businesses searched was unlawful, nor did the affidavits offer such evidence.

The First Circuit in considering the search of a doctor's office for business records indicating a Medicare fraud, held that since the warrant gave "no limitation as to time and there [was] no description as to what specific records [were] to be seized," the discretion of the searching officers was unfettered and the search violated the Fourth Amendment. *United States v. Abrams*, 615 F.2d 541, 543 (1st Cir. 1980). "This is exactly the kind of investigatory dragnet that the fourth amendment was designed to prevent," stated the Court. *Id.* at 543.

■ Reading the warrants in the present case in common sense fashion, as required by *United States v. Ventresca*, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965), the Court finds that the warrants gave the searching agents abundant authority, but insufficient guidance. The Court concludes that the warrants fail to meet the requirement of particularity. "To hold otherwise would be false to the terms of the Fourth Amendment, false to its meaning, and false to its history." *Stanford v. Texas, supra*, 379 U.S. at 486, 85 S.Ct. at 512. Thus, all records seized pursuant to the "reflection of conspiracy" section of the warrants must be suppressed.

## B.  PROBABLE CAUSE

The second major argument advanced by the defendants is their claim that the affidavits and supporting documents in the search warrants failed to provide probable cause for the issuance of the warrants. Originally, the defendants directed this part of their motions primarily to the films and magazines seized pursuant to the warrants. However, the government has announced that it will not seek to introduce those seized materials in evidence. Consequently, the critical question has shifted from one based predominantly on the First Amendment to one based on general Fourth Amendment law.

■ As to the films and magazines, which are presumptively protected First Amendment material, the law appears clear that no such material may be seized for its obscene character until a detached, impar-

tial magistrate has made an independent probable cause determination of obscenity based on prior careful scrutiny of the material. *Lee Art Theatre, Inc. v. Virginia*, 392 U.S. 636, 88 S.Ct. 2103, 20 L.Ed.2d 1313 (1968); *Roaden v. Kentucky*, 413 U.S. 496, 503, 93 S.Ct. 2796, 2800, 37 L.Ed.2d 757 (1973); *Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319, 326, 99 S.Ct. 2319, 2324, 60 L.Ed.2d 920 (1979); *United States v. Hunt*, 496 F.2d 888, 895 (5th Cir. 1974). In *Penthouse International, Ltd. v. McAuliffe*, 610 F.2d 1353, 1362 (5th Cir. 1980), the Court stated:

> Taken together, *Heller* [413 U.S. 483, 93 S.Ct. 2789, 37 L.Ed.2d 745 (1973)] and *Roaden* establish the minimum constitutional requirement for a seizure of allegedly obscene materials. The Constitution at a minimum apparently requires the imposition of a neutral, detached magistrate in the procedure to make an independent judicial determination of probable cause prior to issuing an arrest warrant or some other warrant authorizing the seizure of allegedly obscene material to be used as evidence. See *Lee Art Theatre [supra]* . . . . [Emphasis supplied]

The government contended that the films and magazines in this case were not seized for their obscene character, or rather that the justification for their seizure is not that their possession by the defendants was illegal. Instead, argued the government, they were seized purely because of the fact that they were found in the business offices of the defendants and, therefore, were evidence of the defendants' ability and willingness to commit the crimes alleged. The defendants responded that the films could only be relevant evidence of a crime if they were in fact obscene; thus, the films were necessarily seized for their obscene character, even if the government admits that their possession by the defendants was entirely lawful.

Since the government will not use the films and magazines in their presentation of these cases, the Court is not called on to directly answer this point. However, the Court is informed by the law concerning seizure of First Amendment material insofar as it is relevant to the general issue of probable cause to seize documents evidencing violations of the federal obscenity statutes.

The defendants maintain that where anything is seized pursuant to warrant as evidence of an obscenity violation, probable cause to believe the crime has been committed is not present unless a neutral and detached magistrate makes a probable cause determination of obscenity based on prior careful scrutiny of the specific materials alleged to be obscene. Furthermore, the defendants contend that the magistrate's obligation is non-delegable, such that the magistrate may not rely on a probable cause finding of obscenity by a grand jury returning an indictment alleging such a violation or by any other person not authorized to issue search warrants and not trained to apply the *Miller v. California*, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), three-part test for determining if material is obscene.

The defendants' probable cause argument is not limited to the obscenity issues but carries over to the issue of probable cause to believe that the single conspiracy charged in the original indictment existed and violated federal law. The defendants assert that reliance on the indictment for this finding falls short of constitutional requirements.

The Fourth Amendment states that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation . . . ." The affidavits and supporting documents in the present case did not contain copies of the allegedly obscene films and magazines, nor were any detailed descriptions of the material submitted to the magistrates. In some cases, the magistrates were not actually given copies of the indictment, but were merely informed of the existence of the original indictment. Essentially, the magistrates, in evaluating any issues as to obscenity, were given nothing else to rely on but the titles of the films, the fact of the indictment charging shipment of particular alleged obscene material, and perhaps the affiant's representation to

the magistrates that the films and magazines were received as part of a confidential or undercover F.B.I. operation. The government concedes that there was no searching focus on or careful scrutiny of the allegedly obscene material by the magistrates.

Similarly with regard to the question of a single conspiracy, the magistrates relied principally on the existence of the indictment. The defendants note that the affidavits contain only two superficial references to the group of forty-five (45) defendants. One, the affidavits state that two undercover agents met with all the defendants over a three-year period; and two, the defendants are identified in terms of the companies with which they are associated. As outlined above, in the Court's discussion of the generality of the warrant (Section III A[2] of this Order), nowhere in the affidavits is the conspiracy described meaningfully; neither do the overt acts in the indictment aid in defining the conspiracy.

However, the affidavits contain substantial factual support for the affiant's claim that certain films were shipped to Miami by the specific defendants to which the various warrants are directed. Thus, for example, the affidavit in support of the search warrant for Sovereign News Company, Cleveland, Ohio, contains factual information regarding specific acts done by defendants Zernic, Assid, and Sturman in shipping certain films from Ohio to Miami.

Since the existence of the original indictment forms the principal basis relied upon by the magistrates for issuance of the search warrants, the crucial question for the Court is whether this fact may properly be considered by the magistrate, and, if so, what weight the magistrate may give it.

The Fifth Circuit stated in *United States v. Melancon*, 462 F.2d 82, 89 (5th Cir. 1972), cert. denied 409 U.S. 1038, 93 S.Ct. 516, 34 L.Ed.2d 487:

Under the constitutional safeguards of the Fourth Amendment, a judicial officer "may not properly issue a warrant to search . . . unless he can find probable cause therefor from the facts and circumstances presented to him under oath or affirmation."

*Nathanson v. United States*, 290 U.S. 41, 47 [54 S.Ct. 11, 13, 78 L.Ed. 159] . . . (1933). *Cf. United States v. Rich*, 407 F.2d 934 (5th Cir. 1969).

■ The reviewing Court must be satisfied that the magistrate was apprised of sufficient facts and circumstances to make a "neutral and detached" judgment. *Johnson v. United States*, 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948). There must be some basis, apart from the mere conclusory statements of the complaining officer, for a determination that probable cause exists. *Giordenello v. United States*, 357 U.S. 480, 78 S.Ct. 1245, 2 L.Ed.2d 1503 (1958). As the Court in *United States v. Ventresca, supra*, 380 U.S. 102, 109, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965), stated:

Recital of some of the underlying circumstances in the affidavit is essential if the magistrate is to perform his detached function and not serve merely as a rubber stamp for the police.

However, the Court in *Ventresca* also stated that the "[t]echnical requirements of elaborate specificity once exacted under common law pleadings have no proper place" in testing the sufficiency of affidavits for search warrants. *Id.* at 108, 85 S.Ct. at 746.

■ The required underlying circumstances may come from hearsay information, if the magistrate is informed of facts indicating that the original source of the underlying information is credible, but this does not mean that the magistrate may rely on hearsay conclusions of unsworn third parties, where the underlying circumstances are not presented. *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). The defendants contend that the latter is what the magistrates did in relying on the original indictment in the present case.

Further, the defendants argue that even if reliance on a conclusionary affidavit were constitutionally adequate, the conclusions of

a grand jury are unreliable, since the active, investigative role of the grand jury places it more in the position of a prosecutor than an impartial judge. In *Coolidge v. New Hampshire*, 403 U.S. 443, 450, 91 S.Ct. 2022, 2029, 29 L.Ed.2d 564 (1971), the Court stated that "prosecutors and policemen simply cannot be asked to maintain the requisite neutrality with regard to their own investigations . . . ." *Coolidge* invalidated a warrant issued by a state attorney general. Although there existed evidence which would have given probable cause to search, the fact that the officer who found probable cause was not a neutral and detached magistrate was an incurable defect in the warrant. In *Lo-Ji Sales, Inc. v. New York, supra*, 442 U.S. at 326, 99 S.Ct. at 2324, the Court stated:

A warrant authorized by a neutral, detached judicial officer is a more reliable safeguard against improper searches than the hurried judgment of a law enforcement officer engaged in the often competitive enterprise of ferreting out crime.

See also *Roaden v. Kentucky, supra*.

The government replies that the grand jury is not an arm of the prosecutor, but an arm of the court and the magistrate may implicitly rely on the neutrality of the grand jury. The government points out that under *Giordenello v. United States, supra*, 357 U.S. at 487, 78 S.Ct. at 1250.

"a warrant of arrest can be based upon an indictment because the grand jury's determination that probable cause existed for the indictment also establishes that element for the purpose of issuing a warrant for the apprehension of the person so charged."

The defendants, without extensively contesting the continued vitality of that rule, contend that it should not be extended to searches and seizures. As Judge Hubert Will, a very distinguished United States District Judge, stated in the case of a search that did not implicate First Amendment rights:

[T]he finding of probable cause for arrest of an individual that accrues from his being indicted does not, however, become

the equivalent of a finding of probable cause for a warrant to search that person's home, his car, or his business office. Probable cause must likewise be shown for any of these searches (except of course, as regards a search incident to a lawful arrest). This distinction is the same as applies in the traditional warrant situation: the mere fact that probable cause has been shown that authorizes a proper warrant of arrest of an individual does not authorize the arresting officer to search beyond the limits of a search incident to that arrest . . . . A specific showing of probable cause in addition to that shown for the arrest warrant is needed before this search may be properly authorized.

*United States v. Bailey*, 327 F.Supp. 802, 806 (N.D.Ill.1971).

With regard to the role of the grand jury, the Court finds that while, in an ideal sense, a grand jury is supposed to be a body independent of any of the three branches of the government, *United States v. Chanen*, 549 F.2d 1306, 1312 (9th Cir. 1977); *United States v. Carroll*, 582 F.2d 942, 944 (5th Cir. 1978), the reality is, and the courts have recognized, that grand juries are under the control of the prosecutor. *In Re Grand Jury Proceedings (Schofield)*, 486 F.2d 85, 90 (3d Cir. 1973); *United States v. Cleary*, 265 F.2d 459, 461, cert. denied 360 U.S. 936, 79 S.Ct. 1458, 3 L.Ed.2d 1548.

The Court in *Schofield* stated:

[T]hey [grand juries] are 'basically a law enforcement agency.' *United States v. Cleary [supra]*. . . . They are for all practical purposes an investigative and prosecutorial arm of the executive branch of government.

486 F.2d at 90.

As a final argument, the government contends that the practical necessity of the search procedure used in the present case indicated its constitutional sufficiency. The contention is that the pragmatic realities of the situation mandate that the warrants be upheld since the complexity of the conspiracy charged in the indictment and the sheer number of the films and magazines in-

volved made it virtually impossible to present the underlying circumstances to seven different magistrates across the country. It would have taken days, contends the government, to demonstrate the necessary evidence to each magistrate. The resultant burden on the court system would be staggering and the chance of additional protection of the rights of the defendants would be minimal.

■ Here, the government is attempting to create an exception to the probable cause requirement of the Fourth Amendment based on the complexity of the indictment returned by a grand jury supervised by the government. The Court is unaware of any such doctrine of pragmatism which can be applied when evaluating rights under the First and Fourth Amendments. If such a test were applicable, it would not be met by the facts of the present searches. Clearly, the government was able to coordinate the simultaneous issuance of 21 search warrants and the searches of some twenty-one separate business offices with a precision equalled perhaps only by the Normandy invasion. The Court fails to see how it would have appreciably burdened that highly successful venture to supplement the applications with detailed descriptions of the films and magazines in question, if not actual copies thereof, and with a succinct factual basis for the alleged conspiracy. While alternative procedures have been suggested by the defendants at oral argument, which the government neither embraced nor rejected, the Court finds no reason to allude to them in this Order.

As noted above, there is, in the affidavits, no substantial evidence of the contents of the films and magazines and only very sketchy evidence of a conspiracy. The affidavits are bereft of facts or underlying circumstances as to both of the essential elements of the conspiracy charge and as to the element of obscenity on the substantive charges.

■ The Court is thus left with the question of whether or not reliance on the indictment in this case gave the magistrates a sufficient basis for the issuance of the search warrants, with specific regard to the probable cause finding as to obscenity and conspiracy. The Court concludes that reliance on the grand jury to safeguard the Fourth Amendment prohibition of warrantless searches and seizures is inadequate protection of this basic constitutional right. The magistrate must make his own determination as to probable cause and may not delegate that responsibility to a grand jury.

■ The grand jurors may or may not have been presented with probable cause for the issuance of the indictment. They may or may not have been informed of the *Miller v. California* test for evaluating obscenity *vel non*. However, there is no doubt that the magistrates who issued these warrants did not know whether probable cause for the indictment existed and they did not know whether probable cause for the search warrants existed. Since the grand jury "was not the neutral and detached magistrate required by the constitution, the search stands on no better footing than if there had been no warrant at all." *Coolidge v. New Hampshire, supra,* 403 U.S. at 453, 91 S.Ct. at 2031. Thus, the fruits of these searches must be suppressed.

## C.  OTHER DEFENSE CONTENTIONS

■ Point (3)  With regard to the defendants' contention that a prior adversary hearing was required before the allegedly obscene films could be seized, the issue has been mooted by the government's stipulation that none of the seized films will be used in evidence. It should be noted, however, that under *United States v. Sherpix,* 512 F.2d 1361 (D.C.Cir.1975), where the seizure is for evidentiary purposes and not to effect a prior restraint of publication, no prior adversary hearing is required. Moreover, the Court has not been confronted with a request by any defendant for a post-seizure hearing to determine obscenity *vel non.*

Point (4)  The Court adopts the findings of the magistrate.

■ Point (5)  There was no testimonial compulsion involved in these searches. It

**140**

is well-established that seizure of documents, as opposed to a subpoena duces tecum, does not amount to testimonial compulsion since the defendant is not being called on to verify the truth of the contents of the documents; thus, the defendant is not being compelled to do anything. The defendant is a passive actor when his documents are seized. *Andresen v. Maryland*, 427 U.S. 463, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976).

Points (6) and (7) The defendants have failed to demonstrate any prior unlawful actions by the government which formed the basis of search warrants in the present case.

Point (8) The defendants failed to allege a single instance of intentional or reckless misrepresentation in the affidavits for the search warrants, thus, under *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978) the defendants are not even entitled to an evidentiary hearing on this issue.

Point (9) There is no support for the proposition that a restraining order, issued against the Broward County Sheriff's Office and requiring the Sheriff to circulate a list of obscene films has any effect on the United States of America which was not a party to that lawsuit.

Point (10) The contention by one defendant that the shifting composition of the grand juries in the Southern District of Florida invalidates any determination by it of the obscenity *vel non* of a film or publication under the community standards rule is rendered moot by the Court's finding that the grand jury is not an appropriate body to make that determination for purposes of a search warrant.

## IV. CONCLUSION

For the reasons stated with regard to the generality of the warrant and the failure of the affidavit to provide the magistrate with probable cause that a crime had been committed, the Motions to Suppress are hereby GRANTED.