IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. PD-0592-10






ROBERT JACKSON CRIDER, Appellant



v.



THE STATE OF TEXAS





ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW


FROM THE FIFTH COURT OF APPEALS


COLLIN COUNTY




 

 Cochran, J., delivered the opinion of the Court in which Meyers, Price,
Johnson, Keasler, Hervey and Alcala, JJ., joined. Womack, J., filed a
dissenting opinion in which Keller, P.J., joined.


O P I N I O N 



 A jury convicted appellant of driving while intoxicated after the trial judge denied his
motion to suppress evidence obtained from a search warrant for blood. The court of appeals
held that the search-warrant affidavit established probable cause to believe that evidence of
intoxication would be found in appellant's blood even though the officer did not specify
when, on the day before he obtained the search warrant, he had stopped appellant. (1) We
granted appellant's petition to address whether a search-warrant affidavit for blood must
contain the time the DWI arrestee was stopped. (2) This is a "bookend" case to State v.
Jordan, (3) in which we recently held that the search-warrant affidavit for blood in a DWI case
established probable cause even though the affidavit did not explicitly state when the officer
stopped the defendant because it was obvious from the context. Under the totality-of-the-circumstances standard set out in Jordan, the affidavit in this case is not sufficient to show
probable cause because there could have been a twenty-five-hour gap between the time the
officer first stopped appellant and the time he obtained a search warrant for blood. We
therefore reverse the court of appeals.

I.


 Wylie Police Sergeant Anthony Henderson executed a search-warrant affidavit on
June 7, 2008, stating that he had probable cause to obtain blood from appellant whom he had
arrested for DWI. The affidavit stated:

 On or about 6-06-2008, I Sgt. A Henderson was stationary at the three way
intersection of s/b E FM 544, Vinson Rd. And County Line Rd. When I
observed suspect vehicle make a left hand turn onto n/b E FM 544 and Cedar
Point. Upon making contact, the driver identified themselves as CRIDER,
ROBERT JACKSON II. I detected a strong odor of alcoholic beverage,
bloodshot eyes and his speech was thick-tongued. During Standardized field
sobriety testing, I observed 4 clues during Horizontal Gaze Nystagmus, and
CRIDER, ROBERT JACKSON II refused to perform the One Leg Stand Test
and the Walk and Turn test. While speaking with CRIDER, ROBERT
JACKSON II outside his vehicle I observed him swaying heavily. Based on
these observations, the defendant CRIDER, ROBERT JACKSON II was
arrested for driving while intoxicated. Defendant CRIDER, ROBERT
JACKSON II was asked to give a breath specimen, which [he] refused.


A Collin County magistrate issued a search warrant based on Sgt. Henderson's affidavit at
1:07 a.m. on June 7, 2008. 

 At the motion to suppress hearing, the defense argued, inter alia, that the affidavit
failed to establish probable cause to search for alcohol in appellant's blood "because the
alcohol does dissipate from the blood" and the officer failed to put the time he had observed
appellant driving while intoxicated in the affidavit. The time of the stop was required so that
the magistrate "could have determined whether or not there was fresh probable cause. . . .
Without that information, you can't determine whether or not to justify having blood forcibly
taken from a citizen in the United States." 

 The prosecutor anticipated the defense argument "that there is a full day, June 6th of
2008, where this crime could have occurred, and being the nature of blood-or alcohol in
blood either absorbing or eliminating, that because there's a 24-hour period, we need to know
a more specific time because of the nature of the blood." But the prosecutor argued that "it
is reasonable to infer that an officer is not going to wait four hours, five hours, ten hours, 12
hours, 24 hours to get this warrant executed." To think that an officer would wait around that
long "goes completely contrary to common knowledge and common sense." Furthermore,
"[a]ny delay in time is beneficial to the defendant," so the officer is going to seek a search
warrant for blood "as quickly as possible because not to do so would not benefit his ultimate
objective[.]"

 The trial judge noted the dearth of case law concerning staleness in a blood search
warrant, and stated, "To tell you the truth, I think that we need some bright line law on the
time on a search warrant." He asked the parties to submit briefs, and then denied the motion
to suppress in a written order.

 After hearing the evidence at trial, the jury found appellant guilty of DWI, and the trial
judge sentenced him to 90 days in the county jail, probated for one year, and an $800 fine. 

 In his sole issue on appeal, appellant claimed that the search-warrant affidavit failed
to establish "recent" probable cause. The court of appeals, relying upon the "uninterrupted
sequence of events outlined in the affidavit," rejected this claim:

 Viewing the facts and circumstances within the four corners of the affidavit,
specifically the factual time-line given by the officer, interpreting the affidavit
"in a common sense and realistic manner," and drawing all reasonable
inferences, we conclude the June 7, 2008, 1:07 a.m. finding of probable cause
by the magistrate was of reasonable proximity to the June 6, 2008 arrest of
appellant. We cannot say it was unreasonable for the magistrate to presume
some evidence of intoxication would be found in appellant's blood when the
warrant was signed. (4)

II.


 The Fourth Amendment requires that "no warrants shall issue, but upon probable
cause, supported by oath or affirmation, and particularly describing the place to be searched,
and the persons or things to be seized." (5) The probable-cause standard means that the
affidavit must set out sufficient facts for the magistrate to conclude that the item to be seized
will be on the described premises at the time the warrant issues and the search executed. (6) 
Thus, in a seminal 1932 case, we first held that an affidavit 

 is inadequate if it fails to disclose facts which would enable the magistrate to
ascertain from the affidavit that event upon which the probable cause was
founded was not so remote as to render it ineffective. (7)


Affidavits are to be read "realistically and with common sense," and reasonable inferences
may be drawn from the facts and circumstances set out within the four corners of the
affidavit. (8) But there must be sufficient facts within the affidavit to support a probable-cause
finding that the evidence is still available and in the same location. We agree that the "proper
method to determine whether the facts supporting a search warrant have become stale is to
examine, in light of the type of criminal activity involved, the time elapsing between the
occurrence of the events set out in the affidavit and the time the search warrant was issued." (9) 
 No hard-and-fast rule sets the outer limit of time between stopping an apparently
intoxicated driver and the existence of probable cause that evidence of intoxication will still
be found within that person's blood. The ultimate criteria in determining the evaporation of
probable cause are not found in case law, but in reason and common sense. The hare and the
tortoise do not disappear over the hill at the same speed. The likelihood that the evidence
sought is still available and in the same place is a function, not just of the watch or the
calendar, but of the particular variables in the case:

 (1) the type of crime-short-term intoxication versus long-term criminal enterprise
or conspiracy;


 (2) the suspect-"nomadic" traveler, "entrenched" resident, or established ongoing
businessman;


 (3) the item to be seized-"perishable and easily transferred" (evanescent alcohol,
a single marijuana cigarette) or of "enduring utility to its holder" (a bank vault
filled with deeds, a "meth lab," or a graveyard corpse); and


 (4) the place to be searched-a "mere criminal forum of convenience or secure
operational base." (10)


"[T]he fundamental point is that when the facts put forward to establish probable cause show
only a single, nonrecurring crime occurring on a specific occasion, the question to be
considered is how long after that [time or] date evidence of that single crime can be expected
to remain at the scene." (11)

 Alcohol in a person's bloodstream disappears quite rapidly, thus the facts cited to
support probable cause to search for alcohol in a DWI suspect's bloodstream become stale
quite rapidly. Blood-alcohol levels are usually described in terms of blood-alcohol content
(BAC). BAC refers to the concentration of alcohol in the blood, measured in grams of
alcohol for every one hundred milliliters of blood volume. (12) Hypothetically, a person whose
blood had one gram of alcohol for every one hundred milliliters of blood would have a BAC
of 1 and a blood-alcohol concentration of 1% ("weight per volume"). This is hypothetical
because a person with a BAC of 1 would literally be pickled in alcohol. A person whose
blood contains 0.10 grams of alcohol for every one hundred milliliters of blood will have a
BAC of 0.10 (a more realistic and typical situation). Every hour, the "average" person
eliminates somewhere between 0.015 and 0.020 grams of alcohol for every one-hundred
milliliters of blood. (13) In other words, a BAC of 0.10 will go down by 0.015 to 0.020 every
hour in an average person.

 Assuming that a suspect did not drink after being stopped by an officer, at least
"some" evidence of alcoholic "intoxication" (defined as 0.08 BAC) should still be in his
blood system four hours later because it takes at least four hours for the average person to
eliminate 0.08 grams of alcohol (per one hundred milliliters of blood) at a rate of 0.02 grams
of alcohol (per one hundred milliliters of blood) per hour. Put simply, it takes four hours of
hourly 0.02 BAC decreases to make a BAC of 0.08 drop to zero. 

 The higher the level of intoxication at the time of the stop, the longer some evidence
of alcoholic intoxication would remain in the blood. For example, if the average person's
blood-alcohol level were twice the limit of legal intoxication, with a BAC of 0.16 at the time
he were stopped, his level would be approximately 0.08 four hours later, and some level of
alcohol would still be in his blood up to seven to eight hours later. (14) But it would be
exceedingly unlikely that a person who was tested some 24 hours after he ceased drinking
would register any detectible level of alcohol in his blood. (This would correspond to an
initial blood-alcohol content of 0.48, six times the legal limit and nearly lethal.) (15)

 With these general principles in mind, we turn to our recent, unanimous decision in
Jordan v. State (16) concerning staleness in DWI search-warrant affidavits for blood and
contrast it to the present case.

III.


 In Jordan, the police officer presented his search-warrant affidavit to the magistrate
on June 6, 2008. The magistrate signed the warrant at 3:54 a.m. The officer's affidavit
stated that the defendant "committed the offense of Driving While Intoxicated on June 6,
2008, and then described the driving and intoxication that constituted elements of that
offense." (17) We noted that the magistrate "needed to know when the [defendant] was stopped
in order to determine the probability that evidence of an offense would be found in the
[defendant's] blood at the time the warrant issued." (18) 

 The officer should have included the time that he stopped or arrested the defendant. (19) 
As Professor LaFave has stated, if "the time of the occurrence of the facts relied upon is
critical in determining whether there is probable cause to search, then surely 'failure to state
when the alleged facts occurred is fatally defective.'" (20) Nonetheless, that omission was not
fatal in Jordan because the officer did say that the defendant had committed the offense on
June 6th, so necessarily there was less than a four-hour interval between the initial stop and
the signing of the warrant at 3:54 a.m. on that same date. Thus, it was unlikely that all
evidence of intoxication had dissipated from the defendant's blood in that four-hour period,
given the intoxication symptoms set out in the affidavit. (21)

 Compare that four-hour window in Jordan with the twenty-five-hour window in the
present case. Here, Sgt. Henderson stated in his affidavit that he saw appellant make a left-hand turn without signaling on June 6, 2008. No time is mentioned. Nothing in the affidavit
indicates whether it was light or dark outside. (22) No fact within the affidavit could help
inform the magistrate about when on June 6th Sgt. Henderson saw this turn. Sgt. Henderson
stopped appellant and noticed that appellant (1) had "a strong odor of alcoholic beverage";
(2) had "bloodshot eyes"; (3) had "thick-tongued" speech; (4) "sway[ed] heavily." Based on
these observations, as well as "clues" during an HGN test, Sgt. Henderson arrested appellant
and asked him to give a breath test. Appellant refused. 

 The next day, at 1:07 a.m., a magistrate signed Sgt. Henderson's affidavit in support
of a search warrant for blood. There was ample probable cause to believe that appellant was
intoxicated at the time he was driving. But nothing in "the four corners" of the affidavit (23)
suggests what time gap existed between the last moment of driving and the moment the
magistrate signed the warrant. The longer the time gap between the initial stop and the
eventual signing of the warrant, the less likely that evidence of intoxication would still be
found in appellant's blood. We know that the gap was more than one hour, but it could have
been as much as twenty-five hours. (24) 

 The State argues, and the court of appeals agreed, that Sgt. Henderson must have
performed an "unbroken chain" or "uninterrupted course" of action between stopping
appellant, determining that he was intoxicated, arresting him, writing out an affidavit, and
obtaining the magistrate's signature on the search warrant. But there is no fact in the
affidavit that would support such an inference and no language indicating any amount of time
that may have elapsed between the various events. "It is one thing to draw reasonable
inferences from information clearly set forth within the four corners of an affidavit . . . [but
it] is quite another matter to read material information into an affidavit that does not
otherwise appear on its face." (25) There is simply no fact in this affidavit that would give rise
to a reasonable inference that Sgt. Henderson performed an "unbroken chain" of actions that
connected his detention of appellant to the signing of the warrant within a sufficiently short
time frame that evidence of intoxication would still be in appellant's blood. (26)

 Under the totality-of-the-circumstances test and giving due regard to all reasonable
inferences that can be drawn from the stated facts, the affidavit in this case, unlike the one
in Jordan, does not contain sufficient facts within its four corners to establish probable cause
that evidence of intoxication would be found in appellant's blood at the time the search
warrant was issued. 

 We therefore reverse the judgment of the court of appeals and remand this case to the
trial court for further proceedings not inconsistent with this opinion.

Delivered: November 16, 2011

Publish
1. Crider v. State, No. 05-09-00926-CR, 2010 WL 1294094 (Tex. App.--Dallas April 5,
2010) (not designated for publication).
2. Appellant's first ground for review reads: "Because the affidavit did not contain the time
that Appellant was stopped or arrested, did the search warrant issue without probable cause?"
3. 342 S.W.3d 565 (Tex. Crim. App. 2011).
4. Crider, 2010 WL 1294094 at *2.
5. U.S. Const. Amend IV; see Jordan, 342 S.W.3d at 568.
6. Schmidt v. State, 659 S.W.2d 420, 421 (Tex. Crim. App. 1983) ("The facts submitted to
the magistrate . . . must be sufficient to justify the conclusion that the property that is the object
of the search is probably on the premises to be searched at the time the warrant issues."); Cassias
v. State, 719 S.W.2d 585, 588 (Tex. Crim. App.1986).
7. Garza v. State, 48 S.W.2d 625, 627-28 (Tex. Crim. App. 1932) (op. on reh'g).
8. Davis v. State, 202 S.W.3d 149, 154 (Tex. Crim. App. 2006); Hankins v. State, 132
S.W.3d 380, 388 (Tex. Crim. App. 2004).
9. McKissik v. State, 209 S.W.3d 205, 214 (Tex. App.--Houston [1st Dist.] 2006, pet.
ref'd); Gonzales v. State, 761 S.W.2d 809, 813 (Tex. App.--Austin 1988, pet. ref'd). As the
Tenth Circuit has explained,

 Probable cause is not determined by merely counting the number of days between
the time of the facts relied upon and the warrant's issuance. The significance of
the length of time between the point probable cause arose and when the warrant
issued depends largely upon the property's nature, and should be contemplated in
view of the practical considerations of every day life. The test is one of common
sense.

United States v. Brinklow, 560 F.2d 1003, 1005-06 (10th Cir. 1977) (citations omitted).
10. See United States v. Hython, 443 F.3d 480, 485 (6th Cir. 2006) ("The expiration of
probable cause is determined by the circumstances of each case, and depends upon the inherent
nature of the crime. Relevant variables include 'the character of the crime (chance encounter in
the night or regenerating conspiracy?), the criminal (nomadic or entrenched?), the thing to be
seized (perishable and easily transferable or of enduring utility to its holder?), the place to be
searched (mere criminal forum of convenience or secure operational base?)'") (citations
omitted); Andresen v. State, 331 A.2d 78, 106 (Md. Ct. Spec. App. 1975), aff'd 427 U.S. 463
(1976).
11. 2 Wayne R. LaFave, Search and Seizure § 3.7(a) at 375-76 (4th ed. 2004).
12. Tex. Penal Code § 49.01(1)(B); see John Brick, Characteristics of Alcohol:
Chemistry, Use, and Abuse, in Handbook of the Medical Consequences of Alcohol and
Drug Abuse 3 (John Brick ed., 2004); William J. Chambliss, Courts, Law, and Justice 64
(2011).
13. See State v. Mechler, 153 S.W.3d 435, 448 (Tex. Crim. App. 2005) (Cochran, J.,
concurring); Mata v. State, 46 S.W.3d 902, 906 (Tex. Crim. App. 2001) (Johnson, J.,
concurring).
14. See, e.g., State v. Dugas, 296 S.W.3d 112, 117-18 (Tex. App.--Houston [14th Dist.]
2009, pet. ref'd) (magistrate had a substantial basis for concluding that evidence of intoxication
would be found in defendant's blood even though no time of arrest was set out in the affidavit
because a maximum of six hours could have elapsed from the time officer stopped defendant
until the time magistrate signed warrant).
15. See, e.g., E. Wilson & W.S. Waring, Severe Hypotension and Hypothermia Caused by
Acute Ethanol Toxicity, 24 J. Emergency Med. e7 (2007) ("Concentrations [greater than] . . .
450 mg/dl . . . are potentially fatal, and associated with coma, respiratory arrest, and circulatory
collapse"). 450 mg/dl is equivalent to 0.45 grams per one hundred milliliters, or a BAC of 0.45. 
16. 342 S.W.3d 565 (Tex. Crim. App. 2011).
17. Id. at 570.
18. Id.
19. A number of recent appellate opinions would have been wholly unnecessary if this
simple fact were automatically and routinely included in all DWI blood search-warrant affidavits.
20. 2 Wayne LaFave, supra note 11, § 3.7(b) at 392.
21. Id. at 571.
22. Compare Wheat v. State, No. 14-10-00029-CR, 2011 WL 1259642, *5 (Tex. App.--
Houston [14th Dist.] April 5, 2011, pet. ref'd) (not designated for publication) (despite officer's
failure to list the time that he stopped DWI defendant, affidavit for search warrant sufficed to
show that evidence of intoxication would still be found in defendant's blood because the
affidavit stated that the defendant was stopped on the same August date that the affidavit was
written, the officer stated that he had asked the defendant if she had been drinking that night, and
the affidavit was faxed to the magistrate at around 12:30 a.m. the next morning; reasonable to
infer that the defendant was stopped after dark in August and therefore the time frame between
stop and sending affidavit was no more than about four to five hours); Jezek v. State, No. 03-09-00575-CR, 2010 WL 3431677, *3-4 (Tex. App.--Austin Aug. 31, 2010, no pet.) (not designated
for publication) (although affidavit failed to state the time that a traffic stop occurred, it included
other facts from which the magistrate could reasonably infer that some alcohol would still be in
defendant's blood; officer stated in his affidavit that defendant was pulled over for failing to dim
her high beams, that she had admitted to drinking earlier in the evening, and that after defendant
was taken to the police station, an officer was called to help conduct an intoxilyzer test at 3:42
a.m. that morning and search warrant was issued at 4:52 a.m.; sufficient facts to support
conclusion that original stop occurred shortly before or after midnight).
23. We are required to assess probable cause in an affidavit by looking solely within the
"four corners" of the affidavit, although we, like the magistrate, may draw reasonable inferences
from the specific facts set out in that affidavit. Hankins v. State, 132 S.W.3d 380, 388 (Tex.
Crim. App. 2004).
24. See United States v. Button, 653 F.2d 319, 324-25 (8th Cir. 1981). This case gave rise
to the so-called "Button Rule" of staleness:

 Generally when the courts are forced to make an assumption as to when
transactions occurred "within" a given period, for purposes of determining
probable cause, it must be assumed that the transactions took place in the most
remote part of the given period. . . . The reason for this policy is obvious. If this
were not the construction given to this phrase, stale information could be made to
appear current by the mere use of "within" language. For example, if a dozen drug
purchases were made in the first week of January and one wished to obtain a
search warrant in the first week of March based solely on this information he
would need only say that "within the last two months a dozen purchases were
made", rather than "a dozen purchases were made in the first week of January."

Id. at 324-25 (quoting Commonwealth v. Novak, 335 A.2d 773, 774 (Pa. Super. Ct. 1975)).
25. Cassias v. State, 719 S.W.2d 585, 590 (Tex. Crim. App. 1986).
26. See Schmidt v. State, 659 S.W.2d 420, 421 (Tex. Crim. App. 1983) (when no facts in
the affidavit demonstrated at what time an incident took place, "[i]t is apparent that the
magistrate could not ascertain the closeness of time to issue the warrant based on an independent
judgment of probable cause") (quoting Heredia v. State, 468 S.W.2d 833, 835 (Tex. Crim. App.
1971)). The facts and holding of Schmidt were discussed in some detail in Jordan, in which we
stated,

 The problem in Schmidt was that the affiant described a series of events of
indeterminate duration--from driving while sniffing cocaine, to finding the
vehicle, to calling the ambulance, to providing medical treatment. The magistrate
needed to know how much time elapsed between the events and the submission of
the affidavit in order to determine the probability of evidence's being found in the
vehicle when a warrant issued. But the only date given was that of the alleged
possession, while the events supporting the allegation could have occurred at
some remote time.

Jordan, 342 S.W.3d at 570-71. The problem in this case is the same as that in Schmidt-the
affiant described a series of events of indeterminate duration-from seeing appellant turn left
without signaling, to stopping his car, to requesting field sobriety tests, to conducting an HGN
test, to arresting appellant, to transporting him to the police station, to asking him to give a breath
sample, to drafting an affidavit for a search warrant, to finding a magistrate, to faxing the
affidavit and warrant to the magistrate. There is nothing in the affidavit to show when these
events began or how long each one took.